## SOUTHERN PAC. CO. v. CITY OF CALEXICO et al.

(District Court, S. D. California, S. D. February 8, 1923.)

No. F-109.

1. **Commerce ⬅77—Right of import to be free from state taxation not affected by nonexistence of federal import duty.**

Even though an imported article be imported free of duty, as being on the free list, it is entitled to be free from the payment of anything imposed by a state in the nature of an import duty, under Const. art. 1, § 8, and article 1, § 10.

2. **Commerce ⬅31—Imported article remains an import until merged into general mass of property.**

Under Const. art. 1, §§ 8, 10, an imported article retains the quality of an import until, by some act of the owner, it has been merged into the general mass of property of the country.

3. **Commerce ⬅77—Offering import for sale does not render it liable to state tax.**

Under Const. art. 1, §§ 8, 10, the mere offering of imported cotton for sale would not render it liable to the state for taxes, even though offered for sale with permission to sample.

4. **Commerce ⬅77—Pledge of imported cotton renders it liable to state tax.**

The pledge or mortgage of imported cotton, by pledge either of the cotton itself or of warehouse receipts therefor, constitutes such beneficial use of it as renders it amenable to the right and taxing power of the state, under Const. art. 1, §§ 8, 10.

5. **Commerce ⬅31—Compressing imported cotton for shipment held not to change its character as import.**

Under Const. art. 1, §§ 8, 10, the compressing for shipment of imported cotton does not so change its original form as to render it liable to state taxation, although in compressing the cover is temporarily removed.

6. **Commerce ⬅31—Storing imported cotton in another's warehouse and subjecting it to storage lien held not to change its character as import.**

Under Const. art. 1, §§ 8, 10, that imported cotton is stored in the warehouse of another than the importer, and thereby incidentally subjected to a storage lien, *held* not to change its character as an import.

7. **Commerce ⬅31—Sale of imported article deprives it of the character of an import.**

Where an imported article is sold after being imported, it loses its character as an import.

8. **Commerce ⬅31—Character of article as import not affected by export tax levied by the country from which imported.**

Whether an imported article has lost its character as an import by its being pledged and hypothecated is not affected by the fact that an export duty was paid thereon to the government of the country from which it was imported.

In Equity. Suit by the Southern Pacific Company against the City of Calexico and others. Judgment in accordance with opinion.

In an action in the nature of interpleader, brought under section 18 of the Act of Congress of August 29, 1916 (Comp. St. § 8604ii), plaintiff alleges that there was delivered to it, on or about March 23, 1922, at Calexico, for transportation and shipment to defendant Minoprio & Co., Liverpool, England, via railroad to San Diego, and thence by water to England, 934 bales of cotton; that such shipment was delivered to and accepted by the plaintiff in due course, plaintiff expecting and agreeing to transport it to

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

San Diego with such reasonable dispatch as its general business would permit, and intending to have it in San Diego that it might be loaded upon a boat leaving that city for Liverpool on or about the 3d day of April, 1922; that the city of Calexico and the other defendants connected therewith, purporting to act in virtue of the laws of the state of California and of the laws and ordinances of said city, levied and assessed a tax upon said shipment of cotton, and pursuant to said assessment and the law governing the same, the tax not being paid, attached said cotton and withheld possession of the same from plaintiff; that thereby plaintiff was prevented from carrying out the terms and conditions of its agreement for the transportation and delivery of said cotton. Plaintiff, disclaiming all knowledge as to the legality of said tax and as to the right of the city to retain possession of said cotton and sell the same under the levy made thereon, thereupon instituted this action, praying that the defendants city of Calexico and its officers, and the defendants Minoprio & Co. and its agent Atkinson, be required to set up their respective claims in and to said cotton, etc.

Answers by way of interpleader were filed by defendants city of Calexico and Minoprio & Co., and the case has been submitted to the court upon an agreed statement of facts. From this statement it is apparent that the only question involved is as to the right of the city of Calexico, acting under the authority granted to it by the state of California, to assess for general purposes of taxation the cotton in question; it being admitted that, if the city had the right to assess the cotton, all the steps leading up to the levying of the assessment of the cotton under the name of "unknown owners" were properly and lawfully taken, and that the valid assessment on and tax due from the owner of the cotton amounted to 91 cents per bale. Pursuant to an order of court, and that the cotton might be released for its trans-oceanic journey, a sum of money sufficient to cover the entire assessment levied against the cotton was deposited by defendant Minoprio & Co. in the registry of the court to abide the event of the judgment. It is stipulated, also, that if the assessment be a legal one, certain detailed expenses incurred in the making of the levy and attachment are properly chargeable against the cotton. All of the cotton taken and seized by the city was in fact owned by the defendant Minoprio & Co. Having entered its claim to the same, it will be hereafter referred to as the claimant. There were 9 separate lots of cotton involved, each of which, in so far as its legal status was concerned, differed somewhat from the others. In order that the respective contentions advanced may be understood, it will be necessary to indicate the precise differences.

All of the cotton was produced, ginned, and baled in, Lower California, in the republic of Mexico. The baling consisted in pressing the cotton into bales of approximately 500 pounds each. They were about 3 by 4 by 5 feet in size, and surrounded and covered on the narrow sides and partially on the other side by cotton bagging, a very coarse and heavy cloth. The whole was held and maintained in the baled condition by four or five steel hoops, known as cotton ties, about one inch wide and the thickness of sheet iron, and being fastened by a sort of buckle. Every bale was marked or stenciled with the owner's initials and the number of the bale. With one exception (lot 6), all of the lots involved herein were either produced, ginned, and baled by claimant, and thereafter by claimant imported from Mexico into the United States, or purchased by claimant in Mexico, from those who had produced, ginned, and baled it, and thereafter, by claimant imported into the United States. By such importing is meant that, en route to Calexico, it was hauled across the international boundary line between Mexicali and Calexico and "entered at the United States customs house at Calexico." At the time of importation, there was no tariff on cotton imposed by the United States government, and in consequence no import duty thereon was paid.

With respect to lot 1, after importation, claimant had same hauled to its private cotton yard and warehouse, located in the city of Calexico, county of Imperial, state of California, where it remained untouched and unchanged in any way until after the first Monday in March, 1922, the date

fixed by the laws of the state of California for the assessing of property in said state, the same being March 6, 1922; that said cotton was not offered for sale, nor pledged nor mortgaged to any one and not mixed with any other cotton but held and stored by itself.

The status of lot 2 was similar to that of lot 1, save that it was "offered for sale to the general public immediately upon its receipt" in claimant's cotton yard, and "continued to be offered for sale until after the said. first Monday in March, 1922." In being offered for sale, it is usual and customary for cotton buyers to inspect said cotton and take samples thereof. The sampling is done as follows: The cotton bagging with which the baled cotton is covered, is slashed or cut practically across one whole side of a bale, said slash being approximately 2 or 2½ feet long, and allowing said bagging to flap open and the lint cotton to flare apart between. the cotton ties of the hoops. The buyer then reaches in and pulls out samples of lint cotton ranging in weight from one-fourth to three-fourths of a pound. Some of the bales in this lot were sampled as many as six or eight times during the period in question. Said cotton was not sold during said period by claimant, but "was mortgaged and pledged by chattel mortgage to the First National Bank of Calexico for moneys advanced by it to claimant after said cotton was imported into the United States, and before March 6, 1922."

The status of lot 3 is similar to the above, save that, after being imported as hereinabove indicated, claimant had this lot hauled and delivered to the cotton yard and warehouse of the Calexico Compress Company, located in Calexico, for the purpose of storage until the time came for its. compression and shipment and there it remained in its baled state until after March 6. Upon delivery of this lot to the compress company, the company issued and delivered its warehouse receipt to claimant for each bale thereof. Said receipts so issued under the laws of California were and are negotiable instruments and transferable by indorsement at the will and pleasure of the holders thereof. Said warehouse receipts evidenced and represented the ownership of said cotton covered thereby, and after issuance by said compress company the ownership of the cotton could only be known and ascertained from the holders of such receipts. After the issuance and delivery of said compress receipts to claimant, the cotton covered thereby remained in the cotton yard and warehouse of the compress company until after March 6, 1922. Said lot was, however, divided up and stored in different parts of the cotton yard, and commingled generally with other cotton in the yard belonging to divers and sundry persons; "such other cotton being composed of both cotton grown, raised, and ginned in the United States and in the republic of Mexico." During all of this time the cotton in this lot was offered for sale to divers and sundry buyers, and samples taken therefrom as hereinabove described. None of this lot was sold by claimant, but during the period of its deposit in the compress company's warehouse, and previous to March 6, 1922, the claimant, in the due course of business, pledged and hypothecated compress receipts covering the same to the First National Bank of Calexico as security for money advanced by said bank to claimant, indorsing compress receipts in blank and delivering them to the bank as aforesaid.

Lot 4, after having been grown, ginned, baled, and imported as above referred to, was hauled and delivered by claimant to the cotton yard and warehouse of the compress company for storage until the time came for its. 'compression and shipment; warehouse receipts being issued by the company and delivered to claimant for each bale so received and stored. This cotton was never sold by claimant, nor was it or warehouse receipts covering the same pledged or hypothecated. Prior to the 6th of March, 1922, however, upon instructions from claimant, the cotton was compressed by the compress company, and until the time of its seizure by the city held for shipment. The compressing of the cotton is a rebaling of the same cotton to facilitate its transportation over long distances. Carriers of cotton require that all baled cotton be compressed at the nearest and most accessible compress to the place of its receipt by such carrier. This may be done,

either by the owner or shipper at his own expense, or the carrier will compress the same and charge the expense to the shipper or .owner. Compression reduces the size of the baled cotton about one-third, and is done for the purpose of saving space in freight cars, ships, etc. In the compression of cotton, the baled cotton is taken from the place where it is stored in the cotton yard and placed on the compress platform. There the cotton ties. or hoops are cut and the cotton bagging cover taken off. Thereupon the bale is placed in the compress, the bagging replaced in such a way as to show the markings on the same, hydraulic pressure is then applied, and the bale reduced to about two-thirds its original size, and if still suitable for such use, the same iron bands or ties theretofore removed from the cotton bale are again placed around it and secured as before.

Lot No. 5 consisted of cotton produced, ginned, and baled by various growers and farmers in Lower California, and thereafter purchased by claimant, and by it imported into the United States as hereinbefore set forth. Thereafter, as heretofore indicated in some other instances, it was by claimant hauled and delivered to the cotton yard and warehouse of the compress company for storage until the time came for compression and shipment. The usual warehouse receipts were issued on this lot, and none of this cotton was either sold or in any manner hypothecated. On the 4th of March, 1922, claimant placed shipping instructions with the compress company for this lot, and issued instructions to said company for the compression of the same, so that it might be shipped to Liverpool, England. At the time of its seizure, this lot had already been loaded in cars for shipment. No bill of lading had been issued by the railroad company however.

Lot No. 6 possessed the same status as No. 5, save that at the time of its seizure by the city the cars in which the same had been placed had been sealed by the railroad company and its usual uniform bill of lading issued by said company to claimant. At the time of its seizure the car was standing on a sidetrack in the compress yard, awaiting arrival of a locomotive to assemble the same in train for shipment to San Diego, etc.

Lot No. 7 enjoyed the same status as the two preceding lots, save that it was either in the compress or on the platform thereof, and not yet loaded upon cars at the time of its seizure.

Lot No. 8 is essentially different from the other lots, in that it was grown, ginned, and baled in the republic of Mexico by unknown owners, and it had by them been imported into the United States previous to March 6, 1922, and had been previous to that time sold by them to claimant herein. It had not yet been compressed, but still remained in the original unbroken packages, with the usual stamps and identification marks of the gin thereon.

Lot No. 9 was grown and produced by various unknown growers and farmers in the republic of Mexico, and being ginned and baled by them at Mexicali, in Mexico, was there purchased by the claimant from such growers. After the purchase it was imported into the United States in the manner heretofore indicated, save that, in addition, at the time of its exportation from the republic of Mexico to the United States, although no import duty was collected by the United States as heretofore indicated, yet an export duty was collected by and paid to the republic of Mexico, pursuant to the laws of that republic, in the amount of $5 per bale. After its importation, it was delivered to the cotton yard and warehouse of the compress company for purposes of storage until the time for its compression and shipment, and it there remained in its baled state until after March 6, 1922. Upon its delivery to the compress company, the usual warehouse receipts were issued to the claimant for each bale thereof, and the cotton was from time to time offered for sale to sundry buyers; samples being taken as heretofore indicated with respect to other lots. This lot of cotton was never sold by claimant. Subsequent to the deposit with the compress company, and previous to the first Monday in March, 1922, claimant in due course of business pledged and hypothecated the compress receipts covering said cotton with the First National Bank of Calexico as security for moneys advanced to it.

W. I. Gilbert, of Los Angeles, Cal., for plaintiff.

Wm. E. Ginder and F. H. Smith, both of Calexico, Cal., for defendants city of Calexico, trustees of said city, and city assessor.

Ault & Anderson, of Calexico, Cal., for defendants Minoprio & Co. and Atkinson.

BLEDSOE, District Judge (after stating the facts as above). The extent and growth of the cotton industry in Lower California, the necessity for its regular importation into the United States, and the frequency which which the taxation questions involved herein will arise, all serve to make it necessary for the court to give extended consideration to this case. As hereinabove indicated, the only questions in the case relate to the power of the city, acting under authority granted to it by the state of California, to assess for general purposes of taxation the respective lots of cotton embraced in the seizure had, and referred to specifically in the foregoing statement of facts. In denial of that power, the claimant relies upon two provisions of the federal Constitution—a clause in section 8 of article 1 reading, "The Congress shall have power * * * to regulate commerce with foreign nations, and among the several States, and with the Indian Tribes," and a clause in section 10 of article 1 reading, "No state shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

Under and pursuant to these provisions, the claim, broadly stated, is that all the cotton involved, having been imported from the republic of Mexico to the United States, at all times concerned herein was an "import," within the meaning of that term as used in the constitutional provision just quoted, was subject only to federal control, and was not therefore subject to any tax or burden being laid thereon by the state of California or any of its instrumentalities. Quite as broadly, the city contends that, no import duty having been levied or paid, and by various acts of the importer the commodity having been incorporated into the general mass of property in this state, like that general mass it ought to be subject to the payment of its proportionate part of the expenses of the local government under whose protection it rests.

The controversy thus broadly presented received the careful consideration of the Supreme Court of the United States in Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678. The principles therein announced by Chief Justice Marshall "have been upheld by nearly all courts that have since dealt with the subject of commerce," and "equal in dignity and power the other great constitutional pronouncements of the great Chief Justice." Beveridge's Life of Marshall, vol. IV, pp. 454, 459. Chief Justice Marshall in that decision vigorously defends the doctrine that, under the Constitution, to the federal government alone is given authority to regulate commerce with foreign nations and to levy duties on imports and exports, save with respect to the particular exception noted. By the same token, a state is denied the right to levy anything in the nature of a duty or burden on imports. The duty or burden therein referred to is not merely a duty

on the act of importation, but a duty or burden on the thing imported. After a thing, however, shall have been imported into the country, and from any cause or for any reason shall have been merged "with the mass of property in the country," or even reduced to some beneficial use therein, as I understand the decision, then, of course, it is competent for the state to assert its own prerogative, and lay such a burden upon the article by way of tax as shall be deemed meet and necessary. So that, under that great decision, the question to be determined in every case is whether or not the thing imported is still to be classed as an import, or may be said, because of the use made of it, the change wrought in it, or the manner in which it has been "acted upon," to have "become incorporated and mixed up with the mass of property in the country." In other words, the importer, before he has been "allowed to exercise his rights of ownership" over the thing imported, or before he has reduced the thing to some use beneficial to himself or made some disposition of it beneficial to himself, is entitled to regard it merely as an "import," and not a part of the mass of the property of the state susceptible to state taxation.

Brown v. Maryland was considered and quoted with approval by the Supreme Court in Low v. Austin, 13 Wall. 29, 20 L. Ed. 517, and it was there held, with respect to wine imported into California and held in storage for more than a year, pending a disposition of the same, that the state of California had no authority to levy or collect a tax on the same and that:

"Goods imported do not lose their character as imports, and become incorporated into the mass of property of the state, until they have passed from the control of the importer or been broken up by him from their original cases. * * * Imports, therefore, whilst retaining their distinctive character as such, must be treated as being without the jurisdiction of the taxing power of the state."

[1] The application of the principles announced in these two cases will, I am persuaded, suffice easily to determine the legality of the various assessments involved in this case. In the first place, I see nothing in the contention of the city that the ruling announced in Brown v. Maryland is inapplicable because of the fact that there an import duty or tariff was actually paid, while here, cotton being on the free list, no such duty was paid. The language used in Brown v. Maryland must be construed with reference to the case then before the court, which involved a transaction in which an import duty had actually been paid as for the thing imported. The reasoning of the decision, however, and the language of the Constitution itself, serve to indicate, in my judgment, that the rule to be applied would be the same, whether a slight import duty was levied, or the article, because of controlling features of governmental policy, was admitted without tariff duty.

The precise question has in fact been determined adversely to the contention of the city in Imperial Development Co. v. City of Calexico, 47 Cal. App. 666, 671, 191 Pac. 50, in which case a petition for a rehearing in the Supreme Court of the state was denied. 47 Cal. App. 673, 191 Pac. 50. The reasoning advanced therein, I think persuasive. In addition, there is nothing to be derived from the language of the

Constitution itself to the effect that the state might impose a tax in the nature of an import duty in the absence of such imposition by Congress. On the contrary, the state is permitted to burden an import·in such a way only in the event that "the consent of the Congress" shall have been secured. There is no claim here that the consent of Congress to the laying of anything approaching the nature of an import duty has been given. The most that can be said is that Congress itself has failed or refused to prescribe any import duty with respect to the particular commodity involved. A presumed governmental policy exempting cotton from import duties could hardly be said to be a "consent" that the states might levy such duties. Moreover, under the provision of section 8, art. 1, of the Constitution, the right to "regulate commerce with foreign nations"· is within the exclusive domain of Congress, and such right is not limited to the levying of duties in respect to the admissibility of imports. It comprehends the right, in the consummation of a predetermined federal policy, to admit goods free of duty or import charge.

This view is sustained, in my judgment, by the decision in the License Cases, 5 How. 504, 12 L. Ed. 256. There Chief Justice Taney, who was himself counsel for the state of Maryland in the Brown Case, after adverting to the fact that the logic of Marshall's reasoning had served to convince him of the propriety of the judgment entered against him, said that in that case (Brown v. Maryland) the court had—

"held that an article *authorized by a law of Congress to be imported* continued to be a part of the foreign commerce of the country while it remained in the hands of the importer for sale, in the original bale, package, or vessel in which it was imported; that the authority given to import necessarily carried with it the right to sell the imported article in the form and shape in which it was imported, and that no state, either by direct assessment or by requiring a license from the importer before he was permitted to sell, could impose any burden upon him or the property imported *beyond what the law of Congress had itself imposed.*"

[2] In this view of the case, then, the actual collection by the federal government of an import duty is an immaterial factor. The determination, for good cause it must be assumed, that cotton should come in free of duty, is a determination which the federal government under the Constitution was entitled to make, and a determination which no state government may be permitted to gainsay. So that, even though, pursuant to federal determination, the article be imported free from duty, yet as long as it remains an "import," it is entitled to be free from the payment of anything imposed by the state in the nature of an import duty; and, of course, under the rule in Brown v. Maryland, it retains the quality of an import until, by some act of the owner, it has been merged into the general mass of the property of the country.

It is urged by the city that such a construction of the law is unjustly discriminatory against the American producer, in that such producer is compelled to pay the ad valorem tax placed upon his cotton, along with other articles of personal property, found in the state on the first Monday in March, etc., and that the settled disposition to foster and protect American industries against foreign competition justifies

the assertion of the right claimed by the city. The obvious answer, however, is that Congress alone possesses the right to prevent such injustice and to avoid such discrimination.

[3] The second lot of cotton differs from the first only in that it was offered for sale to the general public after its receipt in claimant's warehouse. In furtherance of that offer and in accordance with the custom obtaining in the cotton business, samples of the cotton were taken in the manner hereinabove described. The mere offering for sale would not render the cotton liable to the state for taxes. That, I think, is definitely ruled in Brown v. Maryland, supra, 12 Wheat. 447, 6 L. Ed. 678:

"Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell."

[4] If it could be offered for sale without being subjected to penalty or burden at the hands of the state, it could be offered for sale in the manner known to the trade in that particular commodity; that is, with permission to sample. This in no wise constituted an appropriation of the cotton to a beneficial use by the owner; it was but an incident to the larger right which he enjoyed under the law as an importer of the article. This lot was, however, mortgaged and pledged to the First National Bank of Calexico, as was other cotton in other lots. This was effectuated, either by the cotton itself being pledged, or by warehouse receipts, evidentiary of the presence and ownership of the cotton, being pledged and hypothecated. Such action on the part of the owner of the cotton, I am fully persuaded, constituted such a beneficial use of the same, such a disposition of it, such a segregation of it from its character as an import, as to make it amenable to the right and taxing power of the state. It is conceded that all the authorities, from Brown v. Maryland down, hold that an import loses its character as such, and ceases to be within the protection of the constitutional provisions cited, the moment a sale of it is consummated. In substance, there could not be much difference between a sale of the cotton and a pledge or hypothecation of it as for money advanced. In the one instance, following the usual course, for value received the importer would part with the title and possession; in the other instance, for value received, he would subject himself to the right to be deprived of both the title and possession. In either event the importer would be "so acting upon the thing imported" as to incorporate and mix it with the mass of property in the country. For a purpose *beneficial to himself* an *equitable disposition* of the property was had in the pledge created. This giving of a lien upon the property, arising out of a *beneficial use* thereof, served to divest it of its character as an import and subject it to the jurisdiction of the state.

[5] Lot No. 4 exhibits the additional feature that the baled cotton, after having been imported, was compressed for shipment to England. As illustrated in the ruling in May v. New Orleans, 178 U. S. 507, 20 Sup. Ct. 976, 44 L. Ed. 1165, the Supreme Court of the United

States has adhered with strictness to the doctrine laid down by Chief Justice Marshall in Brown v. Maryland, supra, to the effect that an import is exempt from state taxation while remaining "the property of the importer, 'in his warehouse, in the original form or package in which it was imported.' " This ruling, however, it is obvious, was intended merely to effectuate the requirement that the importer, in order to keep the import from being incorporated with the mass of property in the country, should retain it in the package or form in which it was actually brought into the country. Plainly, it would be difficult to follow an import for the purpose of determining its character as such, if it were permitted to the owner to change its form or the character of its container. The compression which it is claimed the cotton in question suffered, however, did not substantially change the form, aspect, or container of the thing imported. True it is that the cover was temporarily removed; but it was almost immediately replaced, and merely for the purpose of enabling the selfsame article, in no wise changed in character or extent, to be compressed into a smaller space, that it might be shipped more economically. The agreed statement shows that baled cotton must be compressed before it will be accepted for shipment. To hold that it could not be compressed before shipment would be to hold, in effect, that it could not be shipped at all, and therefore could not be sold, without being subjected to the burdens of the state government. This would be in the very teeth of the holdings in Brown v. Maryland, and Low v. Austin.

[6] Relying upon the precise wording employed by Chief Justice Marshall that the thing imported must be by the importer kept "in his warehouse," the point is urged that by the deposit of the cotton in the warehouse and yard of the compress company, rather than in a warehouse belonging to claimant itself, its character as an import was lost. This I believe to be an overrefined distinction. There is nothing in the nature of the holding in Brown v. Maryland to justify the conclusion that the importer, in order to preserve his property as an import per se, must deposit and retain it in a yard or house *belonging to him.* No reason can be advanced why he may not employ the services of some concern holding itself out to the public, as the compress company doubtless was, to act as a depositary for hire of the particular commodity. The controlling question is: Was the property kept segregated from the general mass of property in the state in such a way that it could always be identified, and not subjected to any beneficial use? As long as such was done, I am constrained to hold that it continued to maintain the quality of an import as opposed to a piece of property subject to state taxation.

In the same connection the deposit in the compress yard is criticized, in that the effect thereof was to give to the compress company a lien on the cotton for its warehousing charges, and that this, like unto the lien created by the pledge, was such an "acting upon" the property as to incorporate it into the general mass of property. There is nothing in the record to justify the inference that such a lien was ever created. The warehousing charges may have been fully paid as they became due. But, if such a lien did exist, it was purely incidental to the required storage and safe-keeping of the property, and did not arise out

of any beneficial use thereof as in the case of the pledge. Moreover, to hold that the incidental creation of such a lien extinguished the character of the property as an import would be to hold that the lien for the carriage charges of the carter who brought it across the line likewise extinguished its character as an import. Such a contention overlooks the intent and purpose back of the thing done.

[7] Lot No. 8 was grown in Mexico by unknown owners and *by them imported* into the United States and thereafter sold to the claimant. It, of course, under the rule in Brown v. Maryland, lost its character as an import immediately upon its sale in this country by its owner, and in consequence it is subject to the tax laid.

[8] Lot No. 9 was pledged and hypothecated as some of the other lots, and therefore is subject to the tax levied by the city. The mere fact that an export duty of $5 per bale was paid to the Mexican government upon its importation into the United States would not suffice, in any way, to affect the situation here. By no payment made to the Mexican government could it be said that any right was purchased or acquired in or under the government of the United States or any state thereof.

It follows, from these considerations, that the tax imposed by the city upon lots 2, 3, 8, and 9, consisting of 609 bales in the aggregate, was imposed lawfully and claimant rests under the legal liability of paying the same. The tax imposed upon lots 1, 4, 5, 6, and 7, consisting of 325 bales, was unlawful, in that such lots, at the time of the asserted levy, were imports within the meaning of that term as used in the Constitution and not susceptible to state taxation. The judgment will be that the clerk pay to the city from the funds now in the clerk's registry, the sum of $554.19, being the tax at the rate of 91 cents per bale upon 609 bales, together with the expenses incurred in that behalf, and the costs by plaintiff and interpleader city sustained.