[S. F. No. 22824. In Bank. Dec. 1, 1971.]

HALO SALES CORPORATION, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Respondent.

## COUNSEL

Tuckman, Wertheimer & Phillips, Tuckman & Phillips and Charles W. Tuckman for Plaintiff and Appellant.

Thomas M. O'Connor, City Attorney, and John J. Doherty, Deputy City Attorney, for Defendant and Respondent.

## OPINION

**McCOMB, J.**—Plaintiff appeals from a summary judgment, which ordered dismissal of its action (brought pursuant to § 5138 of the Rev. & Tax. Code) seeking refund of a general property tax paid under protest. Each of the parties sought a summary judgment, and it was stipulated that such a judgment be entered in favor of one side or the other.[1]

---

[1]In ruling for defendant, the trial court entered the following memorandum decision: "Summary judgment will be for the City and County of San Francisco for the amount of the taxes in dispute.

"The parties have stipulated, in order that the matter may be disposed of, that a summary judgment may be entered on one side or the other.

*Facts*:[2] On the first Monday in March 1968, plaintiff had $272,285 worth of candles stored in a warehouse. The candles had been purchased in Japan and were stored in their unbroken original packages. Defendant assessed the candles at a value of $68,071 and levied a tax of $5,990.24 upon the goods. After being denied an import exemption, plaintiff paid the taxes under protest.

Plaintiff maintains a continuing credit relationship with Walter E. Heller & Co. (Heller), in accordance with a written agreement dated February 10, 1967. Under their arrangement, Heller supplies working capital financing, amounting to approximately 80 percent of plaintiff's inventory and accounts receivable. In return, plaintiff has pledged all its inventory and accounts receivable (including those thereafter acquired) as security for the indebtedness owing by it to Heller. Heller does not provide letter of credit financing for the importation of goods from foreign countries, since its financing charges are higher than bank charges. With respect to plaintiff's importation of candles from Japan, however, Heller cooperates with United California Bank (UCB) in the following manner: UCB opens a letter of credit for the account of the Japanese suppliers of the candles. When the shipping documents are received, UCB pays its foreign correspondent bank for drawing on the letter of credit and charges that amount to plaintiff's advance account. Plaintiff's debt to UCB is secured by a lien on the candles. After the candles have cleared customs, they are delivered to Lawrence Warehouse, a public warehouse in San Francisco, where warehouse receipts are issued to Heller. On delivery of the warehouse receipts, Heller pays UCB and adds the amount of the payment to the balance of its continuing loan to plaintiff, UCB's

---

"The plaintiff earnestly contends that the facts bring it within the case of Hooven & Allison Co. vs. Evatt, 324 U.S., 652, and Johnson vs. Los Angeles, 31 C.A.2d, 579. The defendant has earnestly contended that the facts are those set forth in Southern Pacific vs. Calexico, 288 Fed., 634. Actually, the facts in this case lie in a grey area in between.

"In the Southern Pacific case property was hypothecated after it came to rest within the United States. In the two cases cited by plaintiff property was hypothecated outside of the United States and the mortgage remained upon it when it was brought into this country.

"The operative factors in this case are outlined in the agreement of March 2, 1967, between plaintiff's two financial agencies. The important part is as follows:

'It is our intention to continue to lend money to the Corporation and to have a security interest in its accounts receivable and in its inventories after the inventories reach a Lawrence or other warehouse. It is your intention to continue to finance the Corporation's imports and to have a security interest in the merchandise which it imports prior to the time that such merchandise reached such warehouse.'

"Thus, it is apparent that the security agreement on the property, after it comes to rest is a different one than that in transit and this, in the opinion of the Court, brings the facts at Bar within the Calexico case."

[2]Defendant filed no declaration in opposition, and the facts set forth in plaintiff's declaration may therefore be taken as established.

security interest in the candles is discharged by the payment to it, and Heller becomes the prime lien holder.

■ Question: *Does the immunity extended to imports by article I, section 10, paragraph 2, of the United States Constitution continue while the goods remain in their unbroken original packages even if the importer makes use of them by hypothecation after they have reached this country?*

*No.* In *Brown* v. *Maryland,* 25 U.S. (12 Wheat.) 419 [6 L.Ed. 678], the Supreme Court of the United States stated that things imported are imports entitled to constitutional immunity from state and local taxation and that this import immunity continues until the importation process has been completed. At page 441 [6 L.Ed. at p. 686], the court said: ". . . when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports, to escape the prohibition in the constitution."

Pursuant to this reasoning, the courts have held that an article loses its status as an import in any of the following circumstances: When the original package is broken (*Brown* v. *Maryland, supra,* 25 U.S. (12 Wheat.) 419; *Sugarman* v. *State Board of Equalization,* 51 Cal.2d 361 [333 P.2d 333]); when the imported article is irrevocably committed to the use for which it was imported (*Youngstown Co.* v. *Bowers,* 358 U.S. 534 [3 L.Ed.2d 490, 79 S.Ct. 383]; *May* v. *New Orleans,* 178 U.S. 496 [44 L.Ed. 1165, 20 S.Ct. 976]); when the imported article is sold (*Waring* v. *The Mayor,* 75 U.S. (8 Wall.) 110 [19 L.Ed. 342]; *Brown* v. *Maryland, supra,* 25 U.S. (12 Wheat.) 419); when the imported article is consigned by the importer to dealers solely for the purpose of offering the goods for sale in domestic commerce (*Cominco Products, Inc.* v. *State Tax Commission,* 243 Ore. 165 [411 P.2d 85]); and when the imported article is pledged to a third party after its arrival in this country (*Southern Pac. Co.* v. *City of Calexico* (S.D.Cal.) 288 F. 634; *State* v. *Harper* (Tex.Civ.App.) 188 S.W.2d 400).

In the present case, the goods had not been removed from their original packages or sold (the use for which they were imported) and would thus appear to be still clothed with import status and immunity. Defendant, however, contends that *Southern Pac. Co.* v. *City of Calexico, supra,* 288 F. 634, which held that goods in their original packages in a warehouse being held for sale are stripped of their immunity and incorporated into

the general mass of goods if they are pledged or hypothecated, demands a contrary result here. We have concluded that there is merit to this contention.

In *Calexico*, it was said at page 641: "In substance, there could not be much difference between a sale of the cotton and a pledge or hypothecation of it as for money advanced. In the one instance, following the usual course, for value received the importer would part with the title and possession; in the other instance, for value received, he would subject himself to the right to be deprived of both the title and possession. In either event the importer would be 'so acting upon the thing imported' as to incorporate and mix it with the mass of property in the country. For a purpose *beneficial to himself* an *equitable disposition* of the property was had in the pledge created. This giving of a lien upon the property, arising out of a *beneficial use* thereof, served to divest it of its character as an import and subject it to the jurisdiction of the state."

Unlike the situation in *Calexico,* in the present case the hypothecation was in accordance with a financing plan formulated prior to importation of the goods; and plaintiff seeks to distinguish the case on that basis. We have concluded, however, that, looking to the substance, rather than the form, of the transaction (see *Hooven & Allison Co.* v. *Evatt,* 324 U.S. 652, 663 [89 L.Ed. 1252, 1262, 65 S.Ct. 870]), (1) no loan was made to plaintiff by Heller on the goods until after their arrival in this country, and (2) Heller did not obtain a security interest in the goods until after their arrival here.

With respect to (1) above, no contention is made that Heller advanced any sums with respect to the goods sought to be taxed until after their arrival. At that time, UCB required payment; and Heller, in order to provide the new loan thus needed by plaintiff to pay its indebtedness to UCB and obtain a release of UCB's lien, paid UCB the amount "specified" by plaintiff and added the amount of the loan to plaintiff's total indebtedness to it.

With respect to (2) above, it is contended that from the inception of the transaction Heller had a lien, which was subordinated to the lien of UCB, and that Heller's lien became prime once plaintiff's indebtedness to UCB had been satisfied. As a result, it is said, there was no new hypothecation to Heller. Upon analysis, however, it will be seen that any supposed lien in favor of Heller before the goods were placed in the warehouse was illusory, in view of the fact that UCB's lien was to secure the full purchase

price of the goods; and clearly Heller did not succeed to UCB's security interest, since it insisted on a higher rate of interest than was paid to UCB. In other words, by the making of a new loan and the giving of a new security interest, the goods were refinanced after they came to rest in San Francisco.

As found by the trial court, Heller's intent that its security interest come into being only after the goods reached San Francisco appears from the following excerpt from the letter agreement entered into between Heller and UCB: "It is our intention to continue to lend money to [plaintiff] and to have a security interest in its accounts receivable and in its inventories *after* the inventories reach a Lawrence or other warehouse. It is your intention to continue to finance [plaintiff's] imports and to have a security interest in the merchandise which it imports *prior* to the time that such merchandise reaches such warehouse." (Italics added.)

Likewise, the declaration of James Diez, outlining the procedure followed by UCB with respect to the financing of the goods, shows that UCB interpreted the letter agreement to provide for a *substitution* of lien holders after the arrival of the goods in this country. In the declaration, Mr. Diez states: "In brief, UCB advances the purchase money to [plaintiff] which buys candles in Japan and imports them into the United States. By the terms of the letter of credit, the imported goods are at all times until payment therefor pledged to UCB as security for UCB loans to [plaintiff]. Payment is due to UCB when the goods arrive locally and are placed in a public warehouse.

"[Plaintiff's] imports are stored at Lawrence Warehouse, which in turn issues warehouse receipts to HELLER. HELLER pays UCB and is *substituted* for the bank as pledge-holder of the imported goods." (Italics added.)

Plaintiff argues that since it was required to pay a higher rate of interest to Heller, the substitution of Heller as lender did not result in the making of a use of the goods *beneficial* to plaintiff. It must be remembered, however, that UCB was unwilling to continue its loan to plaintiff and would have exercised its lien had plaintiff not satisfied the loan. Under the circumstances, the result of the refinancing with Heller was to save the goods for plaintiff. Thus, by the refinancing plaintiff made a beneficial use of the goods.

■ Although, as indicated in *Calexico*, tax immunity is not divested merely because a lien arises by operation of law for the required storage or transportation of the imported goods (see pp. 642-643 of 288 F.), in the

present case Heller's lien was not a lien of such type, but was one voluntarily given by plaintiff.

■ The judgment is affirmed.

Wright, C. J., Burke, J., and Sullivan, J., concurred.

**MOSK, J.**—I dissent.

In my view, the majority opinion of the Court of Appeal, prepared by Justice Sims and concurred in by Justice Molinari, correctly holds that the goods here in issue did not lose their constitutional immunity as imports merely because their importer employed a prearranged, bifold method of securing credit rather than more burdensome unitary financing. Accordingly, I adopt the opinion of Justice Sims as my own, with certain deletions and additions as hereafter indicated:[1]

[] [In *Hooven & Allison Co.* v. *Evatt* (1945) 324 U.S. 652 [89 L.Ed. 1252, 65 S.Ct. 870], the United States Supreme Court held that imported goods are entitled to the immunity of the constitutional provision even when their purchase is financed by a bank to which they are consigned as security. As the high court explained (at pp. 662-664 [89 L.Ed. at pp. 1262-1263]), "For the purpose of determining whether petitioner was the importer in the constitutional sense, it is immaterial whether the title to the merchandise imported vested in him who caused it to be brought to this country at the time of shipment or only after its arrival here. . . . For in determining the meaning and application of the constitutional provision, we are concerned with matters of substance, not of form. When the merchandise is brought from another country to this, the extent of its immunity from state taxation turns on the essential nature of the transaction, considered in the light of the constitutional purpose, and not on the formalities with which the importation is conducted or on the technical procedures by which it is effected. It is common knowledge to lawyers and businessmen that vast quantities of merchandise are annually imported into this country by purchasers resident here, for sale or manufacture here. Sometimes the buyer completes the purchase abroad, in person, and ships to this country; sometimes, as in this case, the purchase is on unsecured credit, but more often it is under contracts by which the vendor reserves in himself or his agent or a banker a lien or title as security for payment of the purchase price on or after arrival. To say that the purchaser is any the less an importer in the one case than in

---

[1]Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's added parallel citations) are used to denote my additions to the text. (See *Keizer* v. *Adams* (1970) 2 Cal.3d 976, 978, fn. 1 [88 Cal.Rptr. 183, 471 P.2d 983].)

the others, is to ignore the constitutional purpose and substitute form for substance." (Fn. omitted.)]

The declaration filed by the importing taxpayer states, in part, as follows:

"Halo Sales Corporation (hereinafter referred to as HALO) is a California Corporation whose principal business is the importation and sale of candles and related merchandise from Japan. HALO's assets consist almost wholly of inventory and accounts receivable which are pledged to Walter E. Heller & Company (hereinafter referred to as HELLER) as HELLER provides at all times approximately 80% of HALO's working capital requirements. HALO's business increases annually, so that its debt requirement ratio remains fairly constant.

"The cost of debt to HALO is a significant element of expense, and HALO accordingly seeks the lowest cost for its necessary continuing borrowings. On February 10, 1967, HALO and HELLER contracted for the financing of HALO's accounts receivable and inventory, and that contract is still in effect. In brief, HALO maintains a continuing debt to HELLER of approximately 80% of its accounts receivable and inventory, and HALO pledges all of its accounts receivable, inventory, and other property to HELLER as security for that debt.

"HALO imports candles from Japan under the following program:

"1. A letter of credit for the account of suppliers is opened by the United California Bank (hereinafter referred to as UCB);

"2. When the original shipping documents are received by UCB, it pays its foreign correspondent bank for the drawing on the letter of credit and charges that amount to HALO's 'advance account';

"3. Original documents are forwarded to customs broker, Hoyt, Shepston & Sciaroni, and shipment is cleared through customs;

"4. Upon clearance from customs, the merchandise is delivered direct to Lawrence Warehouse, San Francisco, where warehouse receipts are prepared to the order of Walter E. Heller & Company;

"5. Upon delivery of the warehouse receipt to HELLER, it pays UCB the amount charged to HALO's 'advance account' corresponding to each individual shipment;

"6. HELLER adds the amount paid to UCB to the balance of its continuing overall loan to HALO."

The declaration signed by the president of the financing institution,

Walter E. Heller & Company, states in part: "HELLER does not generally provide letter of credit financing for the importation of goods from foreign countries because its charges for such financing exceeds charges of banks. In order to accommodate its customers, it cooperates with the major banking institutions which issue letters of credit in the regular course of their business. . . . HELLER at all times during the importation process has a security interest in the goods themselves, subject to the prior security interest of the United California Bank. When the candles arrive at Lawrence Warehouse, warehouse receipts are issued to HELLER and HELLER, in turn, pays to the United California Bank the amount specified by HALO and becomes the holder of the first security interest in place of United California Bank."

A declaration signed by a representative of United California Bank, the bank furnishing the letter of credit, recites: "UCB is familiar with the business of Halo Sales Corporation (hereinafter referred to as HALO) and provides letter of credit financing to HALO for HALO's purchase and importation of candles from Japan. As a condition for the issuance of such letters of credit, UCB relies upon the lending agreements between Walter E. Heller & Company (hereinafter referred to as HELLER) and HALO. A copy of the letter of credit agreement used by UCB and HALO is attached to this Declaration.

"In brief, UCB advances the purchase money to HALO which buys candles in Japan and imports them into the United States. By the terms of the letter of credit, the imported goods are at all times until payment therefor pledged to UCB as security for UCB loans to HALO. Payment is due to UCB when the goods arrive locally and are placed in a public warehouse.

"HALO's imports are stored at Lawrence Warehouse, which in turn issues warehouse receipts to HELLER. HELLER pays UCB and is substituted for the bank as pledge-holder of the imported goods."

A letter of agreement from Heller to UCB states: ". . . It is our intention to continue to lend money to [Halo] and to have a security interest in its accounts receivable and in its inventories after the inventories reach a Lawrence or other warehouse. It is your intention to continue to finance . . . [Halo's] imports and to have a security interest in the merchandise which it imports prior to the time that such merchandise reaches such warehouse." By this letter Heller subordinated any claims under its general security interest in Halo's accounts receivable and inventory to any security interest of the bank in imported goods prior to the time that the goods reached a domestic warehouse. In return, the bank agreed to waive any claim to Halo's accounts receivable or inventories, on or after the date the

goods reached a domestic warehouse, subject to the following provision, "In the event, however, that prior to the time when any such merchandise reaches such warehouse you advise us in writing that an amount is owing to you with respect to such merchandise, then it is agreed that notwithstanding the foregoing, your security interest in such merchandise shall continue until we have paid directly to you the amount so specified by you, whereupon your security interest shall automatically terminate."

The foregoing facts sustain the importer's contention that the goods in question were constantly hypothecated, from the time of the contract under which they were purchased to and including the lien date, and that they would remain so until they were released for sale in the regular course of business by paying the amount of the purchase price for which they were hypothecated. The question is whether the shift of Heller's security from subordinate to prime destroyed the character of the imported goods in the original packages so that they lost immunity from local taxation conferred by the import clause.

The trial court seized upon Heller's statement that it was his intention to continue to lend money to Halo and to have a security interest in its accounts receivable and in its inventories after the inventories reach a Lawrence or other warehouse. The judge, in his memorandum opinion, concluded: " . . . it is apparent that the security agreement on the property, after it comes to rest is a different one than that in transit and this, in the opinion of the Court, brings the facts at Bar within the *Calexico* case."

In the *Calexico* case it was recognized, however, that the creation of lien for storage, or for transportation into the United States, would not affect the status of the goods. The court said: ". . . if such a lien [for warehousing charges] did exist, it was purely incidental to the required storage and safekeeping of the property, and did not arise out of any beneficial use thereof as in the case of the pledge. Moreover, to hold that the incidental creation of such a lien extinguished the character of the property as an import would be to hold that the lien for the carriage charges of the carter who brought it across the line likewise extinguished its character as an import. Such a contention overlooks the intent and purpose back of the thing done." (*Southern Pac. Co.* v. *City of Calexico, supra,* 288 F. 634, 642-643.)

An examination of the transaction in this case reveals no beneficial use of the imported goods by the importer. The shift in priority of the Heller lien was the result of a prearranged intent and purpose to facilitate the purchase and importation of the foreign goods, and as such should no more serve to destroy the tax immunity of those goods, than would the

incurring of the liens for carriage and storage referred to in the *Calexico* case. In either case the burden of taxation on the goods would have the result of burdening foreign commerce in a manner proscribed by the United States Constitution as interpreted in *Brown* v. *Maryland* and the cases first cited herein.

It should be noted that the agreement between Heller and the importer provides for a general hypothecation of all accounts receivable and inventories, and that Heller obligates itself to lend up to 60 percent of the lower of the cost or market price of Halo's inventories. Under this provision it could be argued that the imported goods, after the issuance of the warehouse receipts to Heller, stand hypothecated for more than their purchase price, and therefore furnish the importer a benefit in the form of an increased basis for credit, whether or not further advances are actually made. If such were the case the principle of *Calexico*, if valid, would apply.

Examination of the agreements reflects that no such benefits accrue to the importer. In the first place, it has already received 100 percent of the cost of the goods at the time the goods were shipped, so there is no obligation on Heller to lend more. Secondly, according to the agreement of the parties, unless the importer is in default, which he is not shown to be, he is entitled to withdraw the goods on paying 60 percent of their value, which in this case appears to be their cost. The importer can make no equitable disposition of the property, under the preexisting agreements, until he has paid off Heller. He has not acquired any beneficial use of the property other than as importer, since from the time this order is accepted until the tax date he was subject to the outstanding lien for the amount of the purchase price. The fact that he was able to obtain services, and a more favorable interest rate from the bank, while the goods were in transit by deferring Heller's lien, should not render the pay-off of the bank an interruption of the importing process. Such an analysis exalts form above substance, and would merely serve to drive the importer to other forms of financing which would afford legitimate tax avoidance. Such steps might of themselves lessen local commerce if they resulted in foreign or out-of-state commitments for financing.

[As counsel for the City and County of San Francisco frankly conceded at oral argument, a ruling which deprives imported goods of their constitutional immunity when their purchase is financed as it was here will simply force the importer in the future to use a unitary method of obtaining credit, thereby incurring greater financing expenses. Those expenses, of course, will be passed on to the ultimate consumer in the form of higher prices. Accordingly, the tax here challenged will result in increasing the cost of

goods to the interior *solely because they are imports*. This is precisely the evil which the constitutional provision was designed to prevent. (See *Brown v. Maryland* (1827) *supra*, 25 U.S. (12 Wheat.) 419, 440 [6 L.Ed. 678, 686]; *Hooven & Allison Co.* v. *Evatt* (1945) *supra*, 324 U.S. 652, 656 [89 L.Ed. 1252, 1258-1259].)] []

I would reverse the judgment with instructions to the trial court to enter judgment for the plaintiff taxpayer.

Peters, J., and Tobriner, J., concurred.