## MAY v. NEW ORLEANS.

No. 332.   Argued March 6, 7, 1900. — Decided May 21, 1900.

May & Co., merchants at New Orleans, were engaged in the business of importing goods from abroad, and selling them.   In each box, or case in which they were brought into this country, there would be many packages, each of which was separately marked and wrapped.   The importer sold each package separately.   The city of New Orleans taxed the goods after they reached the hands of the importer (the duties having been paid) and were ready for sale.   *Held:*

(1) That the box, case or bale in which the separate parcels or bundles were placed by the foreign seller, manufacturer or packer was to be regarded as the original package, and when it reached its destination for trade or sale and was opened for the purpose of using or exposing to sale the separate parcels or bundles, the goods lost their distinctive character as imports and each parcel or bundle became a part of the general mass of property in the State and subject to local taxation;

(2) That *Brown v. Maryland*, 12 Wheat. 419, established these propositions: 1. That the payment of duties to the United States gives the right to sell the things imported, and that such right *to sell* cannot be forbidden or impaired by a State; 2. That while the things imported retain their character as imports, and remain the property of the importer, " in his warehouse, in the original form or package in which it was imported," a tax upon it is a duty on imports within the meaning of the Constitution; 3. That a State cannot, in the form of a license or otherwise, tax the right of the importer *to sell*, but when the importer has *so acted upon* the goods imported that they have been incorporated or mixed with the general mass of property in the State, such goods have then lost their distinctive character as imports, and have become from that time subject to state taxation, not because they are the products of other countries, but because they are property within the State in like condition with other property that should contribute, in the way of taxation, to the support of the government which protects the owner in his person and estate.

THE case is stated in the opinion of the court.

*Mr. D. C. Mellen* for plaintiffs in error. *Mr. J. Ward Gurley* was on his brief.

*Mr. W. B. Sommerville* for defendant in error. *Mr. Samuel L. Gilmore* was on his brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

The plaintiffs in error, a commercial firm in New Orleans, brought this action in the Civil District Court, Parish of Orleans, to prevent the enforcement of certain tax assessments made by the city of New Orleans in the year 1897.

The petition alleged that during the whole of the year 1897 the plaintiffs were engaged in importing for sale foreign goods upon all of which they paid the duties and imposts levied by the United States;

That the Board of Assessors for the Parish of Orleans assessed them for that year $2500 on "merchandise and stock in trade," and $1000 under the head of "money loaned on interest, all credits and all bills receivable, money loaned and advanced or for goods sold, all credits of any and every description;" and,

That such assessments were void for the following reasons: 1. All merchandise and stock in trade had and carried by the plaintiffs during 1897 consisted of dry goods imported by them from foreign countries upon which duties, imposts and import taxes were levied by the United States and paid by them, and which were sold only in unbroken original packages as imported, and the assessment thereon was in violation of Article 1, section 10, paragraph 2, of the Constitution of the United States. 2. All the credits. and bills receivable of the firm during that year consisted wholly of sums due on the purchase price of the above merchandise sold in unbroken and original packages as imported, and the assessment thereon was in violation of the same constitutional provision. 3. The assessment of $1000 upon "money loaned on interest" was unconstitutional,

because the plaintiffs at no time during 1897 had any money loaned on interest.

A temporary injunction having been granted against any sale of the plaintiffs' property for the taxes in question, the city answered denying each allegation of the petition.

The only evidence in the case was the testimony of one of the plaintiffs as to the manner in which the company conducted its business. That testimony—using substantially the words of the witness—may be thus summarized:

Representatives of the firm went to Europe and obtained from different manufacturers samples of goods which were sent to New Orleans and were used by plaintiffs in obtaining what were known as import orders. Besides that method, if any article was thought good they placed what were known as stock orders—that is, they ordered the goods on their own account. But in most cases the firm sold the goods and did not keep a stock on hand. All their goods were imported and customs duties were paid on them. They did not handle domestic goods.

They sold the goods in the packages in which they were received because the bulk of their business was jobbing trade. Two, three or five hundred packages might be ordered. If the order were for five hundred dozen towels, they might come packed two, three or five dozen in a package. Such a package was never broken. If a small customer came in they might sell him one package. It had often happened that customers desired only a sample, in which case a package might be broken to get it. Upon these samples the importers obtained orders. If an order was given for five hundred dozen towels, put up in packages of five dozen each when shipped to the firm by the manufacturer in Europe, they would be enclosed in a wooden case. Cases containing such orders might not come to the firm's store at all but would go directly to the customer unopened. But if there were two or three orders in a case it would be brought to the store, opened, and the different orders taken out. But they never opened any of the packages in the case.

An import order was one placed on samples to be manufactured, and about sixty-five per cent of the firm's business was

done by import orders. They would submit to the buyer a line of samples and he would give an import order with the understanding that the goods ordered were to be manufactured and the delivery of them not made for three or four months. If he placed a stock order it was for goods that were in the store ready for delivery.

Goods were always ordered on the firm's own account. They might receive an order for two hundred dozen towels, but give an order on the manufacturer for five hundred dozen, for three hundred of which they had no order but which they might sell while in process of manufacture. They were the owners of all goods that came to them upon those orders.

The lace handled by them was put up in cartons or pasteboard boxes, each box containing twelve pieces of lace, each piece twelve yards long. In filling orders a number of these cartons or boxes were put in another box or case by the manufacturer and so received by the firm. If a case contained only one order it was sent directly to the customer. If the case happened to contain two or more orders it went to the store, where it was opened and the orders separated.

Bobbinet was received in cases containing thirty, forty or fifty packages of two, three or four pieces each. If a customer wished to buy bobbinet, he was told that he would have to buy at least one package; that they did not sell one piece only but in packages. The bulk of the business in bobbinet was directly on import orders. At times six, seven or eight cases which did not come to the store were sold to one firm. Bobbinet was not sold by the case. If more than one order came in a case it was broken open and the orders separated.

The stock of the firm consisted mostly of bobbinet and household linens. They also kept a number of samples of dolls and toys, household linens, towels, sheets, embroideries and laces.

We here give a part of the examination of the witness: "Q. Some of which goods were sold in these cartons as you describe and not in the original packages? A. Some of which were sold out of stock and some on import orders. Q. Let us make that clear. I understand you to say — let us take this case of cartons of laces. You may order such a quantity of

laces as would consist of, say, fifty cartons, and the factory ships them to you in a large wooden box? A. The packer does that. The manufacturer does not even put them in a case himself, but gets the packer to do that; and there are certain goods not in the lace line, but in the household linen line, which do not come in cases; they come in bales. Q. I want to get a thorough explanation of the way you get at these goods. Say a dozen or more packages of goods are shipped by the manufacturer in a wooden box for convenience, as I understand many of these cases go direct to your customers? A. A great many. Q. And in other cases, where they contain more than one order, the cases are opened by you and the orders separated? A. Yes; but the order is generally sent in the case itself. The goods may be shipped in a wrapper by express. The case does not signify that this is the original package. The original package is the one in which the goods are put up at the factory. If a manufacturer puts up five dozen towels in a package that package is the original package, and if I open that package I break the original package; but, whether he puts those packages in a case or not, it remains in the original package. The original package is the original wrapper put around the goods at the factory, and is known as such in the trade."

In reference to " Money loaned on interest, all credits and all bills receivable, money loaned and advanced or for goods sold, all credits of any and every description " in the assessment, the witness said that the only property possessed by the firm in 1897 of the kind mentioned in those items were bills receivable. Those bills consisted of money due them on sales of imported goods by customers who had given orders which had been filled but for which they had not paid. Some of these goods were sold out of stock and some on import orders. They had no money loaned on interest in 1897. The firm was continuing to do business in 1898 in the same way as in the previous year.

Upon final hearing the Civil District Court adjudged that the assessment in question was unconstitutional and void, and the injunction against the city was made perpetual. That judgment having been reversed upon appeal with directions to dissolve the injunction and dismiss the petition, the contention

here is that the plaintiffs in error have been denied rights and immunities secured to them by the Constitution of the United States.

The Supreme Court of Louisiana, speaking by Mr. Justice Blanchard, said, among other things: "The question, then, which the case really presents is, what is the 'original package'? Is it the package in which the goods are put up for convenience by the foreign manufacturer, or is it the case, the box, the covering in which the goods so put up by the manufacturer are packed for shipment? Is the manufacturer's package the original package in legal interpretation, or must that be held to be the original package which is delivered to the carrier for transportation to the desired destination? If the package put up by the manufacturer be the original package, then plaintiffs' objection to the assessment complained of is well taken. If the case or box in which the goods are placed for shipment be the original package, then their case falls." After referring to some of the adjudged cases, the court said that the authorities supported the contention of the city that the "original package" in this case must be held to be that in which the goods were shipped to and received by the plaintiffs and not the smaller packages put up by the manufacturer and packed in the box delivered to the carrier.

If the goods of the plaintiffs were assessed for taxation before they had ceased to be imports, that is, while in the original packages and before they had, by the act of the importer, become incorporated into the mass of property of the State and were held for use or sale, then the assessment was void under the provision of the Constitution of the United States declaring that no State shall, without the consent of Congress, lay any imposts or duties on imports or exports except those absolutely necessary for executing its inspection laws, as well as under the provision giving Congress power to regulate commerce with foreign nations. Art. 1, §§ 8, 10. Of the correctness of this general proposition, as sustained by the adjudged cases, no doubt is entertained.

Two views of the general question are presented for our consideration.

One is, that the box, case or bale in which the plaintiffs' goods were brought from Europe was not the original package; that each separate parcel or bundle placed in each box, case or bale was itself an original package; and that within the meaning of the Constitution no one of such separate parcels or bundles lost its distinctive character as an import and became part of the mass of property in the State, liable to local taxation, until after that separate parcel or bundle had been sold by the importers. This is substantially the proposition pressed upon our attention by the plaintiffs.

The other view is that the box, case or bale in which the separate parcels or bundles were placed by the foreign seller, manufacturer or packer was to be regarded as the original package, and that upon the opening of such box, able or case for the purpose of using or exposing to sale such separate parcels or bundles, each parcel or bundle lost its distinctive character as an import and became a part of the general mass of property in the State subject to local taxation. This is the proposition advanced on behalf of the defendant.

Let us first inquire as to the consequences that may follow from the interpretation of the clause of the Constitution relating to state taxation of imports upon which the plaintiffs rest their case. In the view taken by them it would seem to be immaterial whether the separate parcels or packages brought from Europe were left in the shipping box, case or bale after it was opened or were taken out and placed on the shelves or counters in the store of the importer for delivery or sale along with goods manufactured or made in this country. In other words, they argue that the importer may sell each separate package either from the box in which it was transported, after it is opened, or from the shelves or counters in his store, without being subjected to local taxation in respect of any package so brought into the country, provided such separate package be sold or offered for sale in the form in which it was when placed in the box, case or bale by the European manufacture or packer. This means that the power of the State to tax goods, the product of other counties, depends upon the particular form in which the European manufacturer or packer, of his own accord

or by direction of the importer, has put them up in order to be sent to this country. The necessary result of this position is, that every merchant selling only goods of foreign manufacture, in separate packages, although enjoying the protection of the local government acting under its police powers, may conduct his business, however large, without any liability whatever to state or local taxation in respect of such goods, provided he takes care to have the articles imported separately wrapped and placed in that form in a box, case or bale for transportation to and sale in this country. In this view, if a jeweller desires to buy fifty Geneva watches for the purpose of selling them here without paying taxes upon them *as property*, he need only direct them to be placed in separate cases, however small, and then put them all together in one box. After paying the import duties on all the watches in the box and receiving the box at his store, he may open the box, and the watches, each one being in its own separate case, may then be exposed for sale. According to the contention of the plaintiffs, each watch, in its own separate case, would be an original package, and could not be regarded as part of the mass of property of the State and subject to local taxation, so long as it remained in that form and unsold in the hands of the importer. Other illustrations arising out of the business of American merchants will readily occur to every one. The result would be that there might be upon the shelves of a merchant in this country, ready to be used and openly exposed for sale, commodities or merchandise consisting of articles separately wrapped and of enormous value that could not be reached for local taxation until after he had sold them, no matter how long they had been kept by the importer before selling them. It cannot be overlooked that the interpretation of the Constitution for which plaintiffs contend would encourage American merchants and traders, seeking to avoid state and local taxation, to import from abroad all the merchandise and commodities which they would need in their business.

There are other considerations that cannot be ignored in determining the time at which goods imported from foreign countries lose their character as imports and may be properly regarded as part of the general mass of property in the State

subject to local taxation. If, as plaintiffs insist, each parcel separately wrapped and marked and put in the shipping box, case or bale, is an original package which, until sold, no matter when, would retain its distinctive character as an import, although the box, case or bale containing them had been opened, and the separate parcels all exposed for sale, what stands in the way of European manufacturers opening branch houses in this country, and selling all their goods put up in the form of separate parcels and packages, without paying anything whatever by way of taxation on their goods *as property protected by the laws of the State in which they do business?* Indeed, under plaintiffs' view, the Constitution secures to the manufacturers of foreign goods imported into this country an immunity from taxation that is denied to manufacturers of domestic goods. An interpretation attended with such consequences ought not to be adopted if it can be avoided without doing violence to the words of the Constitution. Undoubtedly the payment of duties imposed by the United States on imports gives the importer the right to bring his goods into this country for sale, but he does not simply by paying the duties escape taxation upon such goods as property after they have reached their destination for use or trade, and the box, case or bale containing them has been opened and the goods exposed to sale.

Let us see what this court has said when it has had occasion to determine the meaning and scope of the constitutional provision relating to imports.

The leading case is *Brown* v. *Maryland*, 12 Wheat. 419, 436, 441–444. Brown was indicted under an act of the legislature of Maryland supplementary to an act relating to duties on licenses to retailers of dry goods and for other purposes. The second section of the supplementary act provided: "That all importers of foreign articles or commodities of dry goods, wares or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spirituous liquors, etc., and other persons selling the same by wholesale, bale or package, hogshead, barrel or tierce, shall, before they are authorized *to sell,* take out a license as by the original act is directed, for which they shall pay fifty dollars; and in case of neglect or refusal to

take out such license, shall be sujbect to the same penalties and forfeitures as are prescribed by the original act to which this is a supplement." Laws, Maryland, 1821–22, c. 246, p. 168. The indictment having been sustained, the case was brought to this court and was argued with great ability.

It is important to observe that the question presented was not one of ordinary taxation upon property, but it was—to use the words of Chief Justice Marshall—"whether the legislature of a State can constitutionally require the importer of foreign articles to take out a *license* from the State *before* he shall be *permitted to sell* a bale or package so imported?" That question was considered with reference to the clause forbidding the States from laying imposts or duties on imports or exports, except such as were absolutely necessary for executing their inspection laws and also with reference to the commerce clause of the Constitution. Declining to lay down any rule as universal in its application, the court said: "It is sufficient for the present case to say, generally, that when the importer has *so acted upon* the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, *in his warehouse, in the original form or package in which it was imported,* a tax on it is too plainly a duty on imports to escape the prohibition in the Constitution." Again: "The object of importation is sale; it constitutes the motive for paying duties; and if the United States possess the power of conferring the right to sell, as the consideration for which the duty is paid, every principle of fair dealing requires that they should be understood to confer it. . . . The whole course of legislation on the subject shows that, in the opinion of the legislature, the right to sell is connected with the payment of duties."

On behalf of the State of Maryland it was contended that if the importer acquired the right to sell by the payment of duties, he might exert that right when, where and as he pleased, and that the State could not regulate it; that he might sell by retail, by auction, or as an itinerant pedler; that he might intro-

duce articles, such as gunpowder, which would endanger the city, into the midst of its population, as well as articles which would endanger the public health, and thus the power of self-preservation would be denied; and that an importer might bring in goods, as plate, for his own use, and thus retain much valuable property exempt from taxation.

To these objections the court, speaking by the Chief Justice, responded: "These objections to the principle, if well founded, would certainly be entitled to serious consideration. But, we think, they will be found, on examination, not to belong necessarily to the principle, and, consequently, not to prove that it may not be resorted to with safety as a criterion by which to measure the extent of the prohibition. This indictment is against the importer for selling a package of dry goods in the form in which it was imported, without a license. This state of things is changed if he sells them, or otherwise mixes them with the general property of the State, breaking up his packages and traveling with them as an itinerant pedler. In the first case, the tax intercepts the import, as an import, in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated until it shall have contributed to the revenue of the State. It denies to the importer the right of using the privilege which he has purchased from the United States, until he shall have also purchased it from the State. In the last cases, the tax finds the article already incorporated with the mass of property by the act of the importer. He has used the privilege he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them. The same observations apply to plate, or other furniture used by the importer. So, if he sells by auction. Auctioneers are persons licensed by the State, and if the importer chooses to employ them, he can as little object to paying for this service as for any other for which he may apply to an officer of the State. The right of sale may very well be annexed to importation, without annexing to it, also, the privilege of using the officers licensed by the State to make sales in a peculiar way. The power to direct the removal of gunpowder is a branch of the police

power, which unquestionably remains, and ought to remain, with the States. If the possessor stores it himself out of town, the removal cannot be a duty on imports, because it contributes nothing to the revenue. If he prefers placing it in a public magazine, it is because he stores it there, in his opinion, more advantageously than elsewhere. We are not sure that this may not be classed among inspection laws. The removal or destruction of infectious or unsound articles is, undoubtedly, an exercise of that power, and forms an express exception to the prohibition we are considering. Indeed, the laws of the United States expressly sanction the health laws of a State. The principle, then, for which the plaintiffs in error contend, that the importer acquires a right, not only to bring the articles into the country, but to mix them with the common mass of property, does not interfere with the necessary power of taxation which is acknowledged to reside in the States, to that dangerous extent which the counsel for the defendants in error seem to apprehend. It carries the prohibition in the Constitution no farther than to prevent the States from doing that which it was the great object of the Constitution to prevent."

These extracts from the opinion in *Brown* v. *Maryland* establish the following propositions:

1. That the payment of duties to the United States gives the right to sell the thing imported, and that such right *to sell* cannot be forbidden or impaired by a State.

2. That a tax upon the thing imported during the time it retains its character as an import and remains the property of the importer, "in his warehouse, in the original form or package in which it was imported," is a duty on imports within the meaning of the Constitution; and

3. That a State cannot, in the form of a license or otherwise, tax the right of the importer *to sell,* but when the importer has *so acted upon* the goods imported that they have become incorporated or mixed with the general mass of property in the State, such goods have then lost their distinctive character *as imports,* and have become from that time subject to state taxation, not because they are the products of other countries, but because they are property within the State in like condition

with other property that should contribute, in the way of taxation, to the support of the government which protects the owner in his person and estate.

So the question in the present case is whether the plaintiffs, prior to the assessment complained of, had *so acted upon* the goods imported by them as to incorporate them with the mass of the property in the State, and bring them, while in their possession, within the range of local taxation.

We have seen that the plaintiffs, in effect, contend that having paid the duties imposed by the United States they were entitled, without liability to taxation upon the goods as property, to open the boxes in which the separate parcels of goods were transported and put such separate parcels in the hands of agents to be sold wherever, in the State or in the country customers could be found. The separate parcels—such is the effect of the argument—are not to be deemed incorporated into the mass of the property of the State while thus being carried around the country by the importer's agents—no separate parcel, so long as it remained in the particular form in which it was packed in a box or case with other parcels, ceasing to have the character of an import until after it was sold by such agents. This proposition cannot be sustained. We cannot doubt that the goods when placed in the hands of agents for sale, in separate parcels, have been so acted upon by the importer that they have ceased to be imports and have become part of the mass of the property of the State, liable to local taxation. But what is the difference in principle between the case of sales by an importer through travelling agents and the case of an importer who opens the box or case in which his goods, wrapped in separate parcels, were imported, and by employés sells or offers to sell the separate parcels either from the opened box or case in his store or from shelves or counters upon which such parcels have been placed for examination and sale.

In our judgment, the "original package" in the present case was the box or case in which the goods imported were shipped, and when the box or case was opened for the sale or delivery of the separate parcels contained in it, each parcel of the goods lost its distinctive character as an import, and became property

subject to taxation by the State as other like property situated within its limits. The tax here in question was not in any sense a tax on imports nor a tax for the privilege of bringing the things imported into the State. It was not a tax on the plaintiffs' goods because they were imported from another country, but because at the time of the assessment they were in the market for sale in separate parcels and therefore subject to be taxed as like property, in the same condition, that had its origin in this country. We cannot impute to the framers of the Constitution a purpose to make such a discrimination in favor of property imported from other countries as would result if we approved the views pressed upon us by the plaintiffs. When their goods had been so acted upon as to become a part of the general mass of property in the State the plaintiffs stood, with respect to liability to state taxation, upon the same basis of equality as the owners of like property, the product of this country; the only difference being that the importers paid a duty to the United States for the privilege of importing their goods into this country, and of selling them in the original packages—a duty imposed for the purpose of raising money to carry on the operations of the Government, and in many instances, with the intent to protect the industries of this country against foreign competition. A different view is not justified by anything said in *Brown* v. *Maryland*. It was there held that the importer by paying duties acquired the right to *sell* in the original packages the goods imported—the Maryland statute requiring *a license from the State* before any one could *sell* " by wholesale, bale or package, hogshead, barrel or tierce," goods imported from other countries. But it was not held that the right to sell was attended with an immunity from all taxation upon the goods *as property*, after they had ceased to be imports and had become by the act of the importer a part of the general mass of property in the State. The contrary was adjudged.

Without further reference to authorities we state our conclusion to be that within the decision in *Brown* v. *Maryland* the boxes, cases or bales in which plaintiffs' goods were shipped were the original packages, and the goods imported by them

lost their distinctive character as imports and became a part of the general mass of the property of Louisiana, and subject to local taxation as other property in that State, the moment the boxes, cases or bales in which they were shipped reached their destination for use or trade and were opened and the separate packages therein exposed or offered for sale; consequently, the assessment in question was not in violation of the Constitution of the United States.

This disposes of the only Federal question arising on this appeal.

The judgment of the Supreme Court of Louisiana is

*Affirmed.*

MR. CHIEF JUSTICE FULLER, MR. JUSTICE BREWER, MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM dissented.