[Civ. No. 46489. Second Dist., Div. Three. Mar. 25, 1976.]

RALSTON PURINA COMPANY, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

548

**COUNSEL**

John H. Larson, County Counsel, and James Dexter Clark, Deputy County Counsel, for Defendants and Appellants.

Latham & Watkins, Richard F. Alden and John J. Clair, Jr., for Plaintiff and Respondent.

Baker, Ancel & Redmond, Gerald T. Manpearl, G. Emmett Raitt, Stein & Shostak, Willis, Butler, Scheifly, Leydorf & Grant and Charles R. Ajalat as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**POTTER, J.**—This is an appeal from a judgment for plaintiff Ralston Purina Company in its suit for refund of ad valorem personal property taxes levied and collected from it under protest by defendants County of Los Angeles and City of Los Angeles. The personal property taxed was canned tuna stored in plaintiff's warehouses at Los Angeles Harbor. The trial was to the court which made detailed findings of fact based in substantial part upon written stipulations of fact filed with the court. In addition, the court received oral testimony of representatives of plaintiff in respect to the origin and status of the canned tuna which was taxed by defendants.

There was no conflict in the evidence. It showed that the tuna upon which the tax was levied was canned in American Samoa. The cannery was operated directly by plaintiff for a portion of the eight-year period for which the tax was levied. For the remainder of the period, the Samoan cannery was operated by plaintiff's wholly owned subsidiary, a Delaware corporation qualified to do business in American Samoa. After the canning activity was taken over by the subsidiary, it sold its production to the parent in an intercompany transaction pursuant to which the product was transferred to plaintiff in American Samoa. Throughout the eight-year period the canned tuna was transported by plaintiff to Los Angeles Harbor in independently operated steamships. The tuna was shipped as "bright stock";[1] that is, unlabeled cans otherwise ready for consumption. The cans were stacked about four feet high on wooden pallets, the dimensions of which were approximately

---

[1] The labeling was not performed in American Samoa for economic reasons. Once labeled, the product was susceptible to more costly handling damage, and the humidity in American Samoa and on the high seas adversely affected labels. It also appeared that the unlabeled product was better adapted to the use which plaintiff made of it.

three feet x four feet and were covered with heavy corrugated cardboard secured with metal or plastic strips. These palletized containers required no additional packaging. When they arrived in Los Angeles, they were unloaded, cleared through the United States Customs, and stored in leased warehouses operated by plaintiff which were located from one-half to two miles from plaintiff's main plant and main warehouse on Terminal Island.

Comparable canned tuna was also processed at plaintiff's Terminal Island cannery which was operated as a division of plaintiff. The Terminal Island processing plant operated in exactly the same fashion as the plant in American Samoa, and its product was essentially interchangeable.

Plaintiff's domestic production at the Terminal Island plant was labeled and placed in cardboard cases immediately upon completion of the processing and canning. Such labeling and casing was accomplished in plaintiff's main warehouse which was across the street from the Terminal Island cannery. This warehouse served as plaintiff's tuna distribution center for the western half of the United States.

The palletized bright stock from American Samoa was used to supplement the domestic production as required from time to time. When the domestic production did not meet the demand for a particular pack and style of tuna, the palletized containers of Samoan tuna would be removed from storage, transported to the main warehouse where they were broken open, the cans labeled and cased and added to the inventory of domestic tuna ready for distribution. After they were so labeled and cased, the cans of Samoan tuna were not distinguished from domestic tuna. Any one of many labels under which plaintiff's domestic production was sold was affixed, and some of the tuna was sold as bright stock to institutional users and to prepared food processors. There was no set period during which the Samoan tuna remained in storage before it was labeled and cased; it was normal, however, for the Samoan tuna to be stored three or four months.

The testimony of plaintiff's representatives was to the effect that the labeling and casing process cost plaintiff a minute fraction of the cost of production of the tuna, some 20 to 32 cents per case, compared to $17 per case for the most popular pack and style of tuna. Those witnesses also testified that the area of the main warehouse devoted to this activity was miniscule compared to the total area of the Terminal Island facility.

Evidence was offered by plaintiff and received by the court relating to the status of American Samoa as an insular possession, detailing the degree of self-government and political autonomy in effect and the policy of the United States toward that possession.

Included among the stipulated "facts" were the following paragraphs 1 through 3 of the "First Stipulation of Facts":

"1. The taxes sought to be recovered herein are *ad valorem* property taxes and, as such, were either 'Imposts' or 'Duties' within the meaning of Article 1, Section 10, Clause 2 of the United States Constitution.

"2. At no time has the United States Congress 'consented' within the meaning of the above-referenced constitutional provision to the assessment of any of the taxes sought to be recovered herein.

"3. At no time were any of the taxes sought to be recovered herein 'absolutely necessary' for the execution [of] 'inspection laws' within the meaning of the above-referenced constitutional provision."

Article I, section 10, clause 2 of the United States Constitution provides in pertinent part that "no state shall, without the consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for execution of its inspection laws . . . ."

Paragraph 1 of the stipulation was a recognition of the fact that the tax in question was not different in character than the general, nondiscriminatory personal property ad valorem tax dealt with by the United States Supreme Court in 1872 in *Low* v. *Austin,* 80 U.S. (13 Wall.) 29 [20 L.Ed. 517], referred to therein as " 'plainly a duty' " and held to have been invalidly levied upon goods imported for sale which remained " 'the property of the importer in his warehouse, in the original form or package in which it was imported.' " (80 U.S. at p. 33 [20 L.Ed. at p. 519].) Paragraphs 2 and 3 of the stipulation were designed to eliminate the possibility of either exception stated in article I, section 10, clause 2 being applicable.

The principal issues thus presented to the court and disposed of by its findings and conclusions related to (1) whether the tuna was in fact imported when it was transported from American Samoa to the United States, and (2) whether it was imported for sale, bringing it within the exemption established by *Low* v. *Austin,* or was instead "goods that had

been . . . imported for use in manufacturing" and " 'put to the use for which they [were] imported' " and had thereby become subject to local taxation under the rule stated in *Youngstown Co.* v. *Bowers* (1959) 358 .U.S. 534, 548 [3 L.Ed.2d 490, 500, 79 S.Ct. 383].

The trial court held in plaintiff's favor on both these issues. It concluded that "American Samoa is not governmentally united with the 'United States' by and under the Constitution as the term 'United States' is used for purposes of determining what is an 'import' within the meaning of Article I, Section 10, Clause 2," and, therefore, that under the rule stated in *Hooven & Allison Co.* v. *Evatt* (1945) 324 U.S. 652 [89 L.Ed. 1252, 65 S.Ct. 870], goods transported from American Samoa constituted imports. On the second issue the court found that "[p]laintiff imported the canned tuna from American Samoa for the purpose of resale in the normal course of its business. The processing of the canned tuna was completed in American Samoa and plaintiff's labeling and casing a portion of the imported tuna did not constitute manufacture."

The court appears to have correctly decided both principal issues submitted to it. The provisions of title 19, United States Code, establishing customs duties, and the tariff schedules of the United States promulgated thereunder, clearly place American Samoa outside the "customs territory of the United States" and make articles imported therefrom subject to duty.[2]

The evidence clearly supported the court's finding that the labeling and casing of the bright stock in Los Angeles Harbor did not constitute manufacture. The evidence showed that it was more a function of distribution governed by the use to which the tuna was allocated when it was incorporated in the general inventory.

The correctness of the court's holdings on the issues decided, however, is not determinative of this appeal. Since the judgment was rendered, the

---

[2]Title 19 United States Code, section 1401, subdivision (h), defines the term "United States" as including "all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam."

Title 19, section 1202, subsection 2, defines "customs territory of the United States" as used in the tariff schedules to include "only the States, the District of Columbia, and Puerto Rico." Subsection 3, subdivision (a) of section 1202 establishes rates of duty for articles imported from insular possessions. The rate generally applicable is that applicable to friendly foreign powers, except that an exemption is provided for the product or growth of insular possessions if not more than 50 percent of the value of any such product represents foreign materials.

United States Supreme Court, in *Michelin Tire Corp.* v. *Wages,* 423 U.S. 276 [46 L.Ed.2d 495, 96 S.Ct. 535], has overruled the decision in *Low* v. *Austin,* 80 U.S. (13 Wall.) 29 [20 L.Ed. 517]. As Mr. Justice White pointed out in his concurring opinion, none of the parties challenged *Low* v. *Austin* in any of the lower courts or even in the United States Supreme Court, and "the issue of its overruling has not been briefed or argued." (423 U.S. at p. 302 [46 L.Ed.2d at p. 513].) Nonetheless, the court affirmed the judgment of the Supreme Court of Georgia denying exemption, on the basis of overruling *Low* v. *Austin,* and without considering "whether the Georgia Supreme Court was correct in holding that the tires had lost their status as imports" by virtue of their being "mingled with other tires imported in bulk, sorted, and arranged for sale." (423 U.S. at p. 279 [46 L.Ed.2d at pp. 500, 499].) The reason given by the Supreme Court for overruling *Low* v. *Austin* is that it incorrectly held nondiscriminatory ad valorem property taxes were "imposts" or "duties." The court said: "[T]he contrary conclusion is plainly to be inferred from consideration of the specific abuses which led the Framers to include the Import-Export Clause in the Constitution." (423 U.S. at p. 282 [46 L.Ed.2d at p. 501].) In stating its conclusions in this respect, the court said (423 U.S. at pp. 286-294 [46 L.Ed.2d at pp. 503-508]):

"Nothing in the history of the Import-Export Clause even remotely suggests that a nondiscriminatory ad valorem property tax which is also imposed on imported goods *that are no longer in import transit* was the type of exaction that was regarded as objectionable by the Framers of the Constitution. For such an exaction, unlike discriminatory state taxation against imported goods as imports, was not regarded as an impediment that severely hampered commerce or constituted a form of tribute by seaboard States to the disadvantage of the interior States.

"It is obvious that such nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce, probably the most important purpose of the clause's prohibition. By definition, such a tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any importation in a manner inconsistent with federal regulation.

"Nor will such taxation deprive the Federal Government of the exclusive right to all revenues from imposts and duties on imports and exports, since that right by definition only extends to revenues from

exactions of a particular category; if nondiscriminatory ad valorem taxation is not in that category, it deprives the Federal Government of nothing to which it is entitled. Unlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into a country, such *property taxes are taxes by which a State apportions the cost of such services as police and fire protection among the beneficiaries according to their respective wealth; there is no reason why an importer should not bear his share of these costs along with his competitors handling only domestic goods.* The Import-Export Clause clearly prohibits state taxation based on the foreign origin of the imported goods, but it cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the State supplies. See, e.g., May v New Orleans, 178 US 496, 502-504, 507-509, 44 L Ed 1165, 20 S Ct 976 (1900). It may be that such taxation could diminish federal impost revenues to the extent its economic burden may discourage purchase or importation of foreign goods. The prevention or avoidance of this incidental effect was not, however, even remotely an objective of the Framers in enacting the prohibition. Certainly the Court in Brown did not think so. See 12 Wheat, at 443-444, 6 L Ed 678. Taxes imposed after an initial sale, after the breakup of the shipping packages, or the moment goods imported for use are committed to current operational needs are also all likely to have an incidental effect on the volume of goods imported; yet all are permissible. See, e.g., Waring v The Mayor, 8 Wall 110, 19 L Ed 342 (1868) (taxation after initial sale); May v New Orleans, 178 US 496, 44 L Ed 1165, 20 S Ct 976 (1900) (taxation after breakup of shipping packages); Youngstown Sheet & Tube Co. v Bowers, 358 US 534, 3 L Ed 2d 490, 79 S Ct 383, 9 Ohio Ops 2d 438, 82 Ohio L Abs 261 (1959) (taxation of goods committed to current operational needs by manufacturer). What those taxes and nondiscriminatory ad valorem property taxes share, it should be emphasized, is the characteristic that they cannot be selectively imposed and increased so as substantially to impair or prohibit importation.

"Finally, nondiscriminatory ad valorem property taxes do not interfere with the free flow of imported goods among the States, as did the exactions by States under the Articles of Confederation directed solely at imported goods. Indeed, importers of goods destined for inland States can easily avoid even those taxes in today's world. Modern transportation methods such as air freight and containerized packaging, and the development of railroads and the Nation's internal waterways, enable importation directly into the inland States. Petitioner, for example,

operates other distribution centers from wholesale warehouses in inland States. Actually, a quarter of the tires distributed from petitioner's Georgia warehouse are imported interstate directly from Canada. To be sure, allowance of nondiscriminatory ad valorem property taxation may increase the cost of goods purchased by 'inland' consumers. But as already noted, such taxation is the quid pro quo for benefits actually conferred by the taxing State. There is no reason why local taxpayers should subsidize the services used by the importer; ultimate consumers should pay for such services as police and fire protection accorded the goods just as much as they should pay transportation costs associated with those goods. An evil to be prevented by the Import-Export Clause was the levying of taxes which could only be imposed because of the peculiar geographical situation of certain States that enabled them to single out goods destined for other States. In effect, the clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State. A nondiscriminatory ad valorem property tax obviously stands on a different footing, and to the extent there is any conflict whatsoever with this purpose of the clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods *which are merely in transit through the State when the tax is assessed.*

"Admittedly, the wording of the prohibition of the Import-Export Clause does not in terms except nondiscriminatory taxes with some impact on imports or exports. But just as clearly, the clause is not written in terms of a broad prohibition of every 'tax.' The prohibition is only against States laying 'imposts or duties' on 'imports.' By contrast, Congress is empowered to 'lay and collect Taxes, Duties, Imposts, and Excises,' which plainly lends support to a reading of the Import-Export Clause as not prohibiting every exaction or 'tax' which falls in some measure on imported goods. Indeed, Professor Crosskey makes a persuasive demonstration that the words 'imposts' and 'duties' as used in 1787 had meanings well understood to be exactions upon imported goods as imports. 'Imposts' were like customs duties, that is charges levied on imports at the time and place of importation. 'Duties' was a broader term embracing excises as well as customs duties, and probably only capitation, land, and general property exactions were known by the term 'tax' rather than the term 'duty.' 1 W. Crosskey, Politics and the Constitution in the History of the United States, at 296-297 (1953). The characteristic common to both 'imposts' and 'duties' was that they were exactions directed at imports or commercial activity as such and, as imposed by the seaboard States under the Articles of Confederation,

were purposefully employed to regulate interstate and foreign commerce and tax States situated less favorably geographically.

"In any event, since prohibition of nondiscriminatory ad valorem property taxation would not further the objectives of the Import-Export Clause, only the clearest constitutional mandate should lead us to condemn such taxation. The terminology employed in the clause—'Imposts or Duties'—is sufficiently ambiguous that we decline to presume it was intended to embrace taxation that does not create the evils the clause was specifically intended to eliminate. [Fns. omitted.]" (Italics added.)

■ It is clear from the foregoing that the nondiscriminatory general ad valorem personal property tax levied upon plaintiff's tuna stored in its local warehouse was not an "impost" or "duty" and not an invalid property tax upon imports.

The only such taxes which the Supreme Court declined to validate were "property taxes on goods which are merely in transit through the State when the tax is assessed." (423 U.S. at p. 290 [46 L.Ed.2d at p. 506].) ■ The bright stock taxed in this case was in no sense merely in transit through the state. A substantial portion of it was destined for consumption within California, and almost all of it was removed from its original containers and repacked in cases before any further transport occurred.[3] In any event, the storage of the bright stock for normal periods of four months before labeling and casing forecloses any argument that it was in transit.

The only real question posed by the advent of the Supreme Court's decision in *Michelin* is the propriety of a retrospective application of it to validate the prior levy and collection of the taxes in the case at bench. In *Michelin,* the court's new interpretation of article I, section 10, clause 2 of the United States Constitution was retrospectively applied to validate taxes which were levied prior to the time *Low* v. *Austin* was overruled. The matter of retrospective application was not specifically discussed. However, a petition for rehearing was filed by Michelin Tire Corp. The sole ground for this petition was the claim that the decision should be given prospective application only. Petitioner argued that otherwise Michelin which had made "irretrievable pricing decisions based upon the law" as announced in *Low* v. *Austin* would face financial hardship if

---

[3]Only a small fraction of the bright stock was sold in the original palletized containers.

their imported property were subjected to a tax for a past period. The Supreme Court denied the petition for rehearing.

█   Under the circumstances, the absence of any language limiting retrospective application in the opinion of the Supreme Court of *Michelin* must be construed as indicating that the decision is to be given retrospective effect, at least to the extent of validating assessments previously made. In *County of Los Angeles* v. *Faus,* 48 Cal.2d 672, 680-681 [312 P.2d 680], our Supreme Court said:

"The law is settled that there is no constitutional objection to an appellate court's making a choice for itself, in overruling an earlier decision, whether the new rule declared by it shall operate prospectively only or apply retrospectively. (*Great Northern Ry. Co.* v. *Sunburst Oil & Refining Co.,* 287 U.S. 358, 363 et seq. [53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254]; *cf.* Traynor, J., *Sutter Basin Corp.* v. *Brown,* 40 Cal.2d 235, 249 [253 P.2d 649]; *People* v. *Ryan,* 152 Cal. 364, 369 [92 P. 853]; *People* v. *Maughs,* 149 Cal. 253, 263 [86 P. 187]; 17 Minn.L.Rev. 811; 28 Ill.L.Rev. 277; 11 N.C.L.Rev. 323.)

"The determination by the court is dependent upon the equities in each case. It is the general rule that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation and that the effect is not that the former decision was bad law but that it never was the law."

The question of retroactivity of the decision in *Michelin* is, therefore, a matter to be determined by the United States Supreme Court "for itself." Further, in the absence of a determination by that court authorizing prospective application only, the general rule applies that the decision is retrospective in its operation. Recognition that nonretrospectivity is the exception, not the rule, is found in the decision of the United States Supreme Court in *United States* v. *Estate of Donnelly* (1970) 397 U.S. 286 [25 L.Ed.2d 312, 90 S.Ct. 1033], where the court said (397 U.S. at p. 295 [25 L.Ed.2d at p. 319]): "In rare cases, decisions construing federal statutes might be denied full retroactive effect, as for instance where this Court overrules its own construction of a statute, cf. *Simpson* v. *Union Oil Co.,* 377 U.S. 13, 25 (1964), but this is not such a case."

Cases in which the United States Supreme Court has chosen to specify only prospective application clearly indicate that it is the choice of that court to make such determination. For example, in *Cipriano* v. *City of*

*Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897], in announcing such result, the court said: "[W]e will apply our decision in this case prospectively." (395 U.S. at p. 706 [23 L.Ed.2d at p. 652].) In *Allen* v. *State Board of Elections* (1969) 393 U.S. 544 [22 L.Ed.2d 1, 89 S.Ct. 817], the court said, "We give only prospective effect to our decision . . . ." (393 U.S. at p. 572 [22 L.Ed.2d at p. 21].) The United States Supreme Court has taken no such action in this case and has, by its denial of the petition for rehearing, indicated a contrary intent. We are, therefore, unable to conclude that *Michelin* is intended only to apply prospectively.

Though the decision is not ours to make, we further conclude that there is no reason retrospective application should not be given to *Michelin* to validate the personal property taxes actually levied and collected in this case. The Supreme Court has stated in *Chevron Oil Co.* v. *Huson* (1971) 404 U.S. 97 [30 L.Ed.2d 296, 92 S.Ct. 349], the factors it considers pertinent to establish nonretroactivity. It said in that connection (404 U.S. at pp. 106-107 [30 L.Ed.2d at p. 306]): "In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, *e.g., Hanover Shoe* v. *United Shoe Machinery Corp., supra,* at 496, or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, *e.g., Allen* v. *State Board of Elections, supra,* at 572. Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' *Linkletter* v. *Walker, supra,* at 629. Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' *Cipriano* v. *City of Houma, supra,* at 706."

We note in this connection that these standards are comparable to those which have been adopted in the decisions of our Supreme Court bearing upon this matter. In *In re Marriage of Brown,* 15 Cal.3d 838, 850 [126 Cal.Rptr. 633, 544 P.2d 561], our Supreme Court said: "Although as a general rule 'a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation' (*County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680-681 [312 P.2d 680]), we have recognized

exceptions to that proposition when considerations of fairness and public policy preclude full retroactivity (see *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 800-801 [87 Cal.Rptr. 839, 471 P.2d 487]; *Forster Shipbldg. Co.* v. *County of L.A.* (1960) 54 Cal.2d 450, 459 [6 Cal.Rptr. 24, 353 P.2d 736]). In *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 193 [98 Cal.Rptr. 837, 491 P.2d 421], we observed that the resolution of this issue of prospective application turns primarily on two factors: 'the extent of the public reliance upon the former rule, . . . [and] the ability of litigants to foresee the coming change in the law.' In the present case both factors militate against a purely prospective overruling of *French* v. *French*. It is unlikely that a layman would rely upon the *French* rule, or even know of that doctrine; attorneys familiar with the decision in *French* v. *French* would also realize from our opinion in *Marriage of Wilson, supra,* 10 Cal.3d 851 [112 Cal.Rptr. 405, 519 P.2d 165] that the *French* rule was ripe for reconsideration. The unjust distribution of property engendered by the *French* rule should not be perpetuated by denial of *any* retrospective effect to our decision."

Though the decision in *Michelin* overruled precedent of long standing, its status as "clear past precedent" is doubtful. As the opinion in *Michelin* notes, "Scholarly analysis has been uniformly critical of *Low* v. *Austin*." (423 U.S. at p. 282 [46 L.Ed.2d at p. 501].) As early as 1959 in *Youngstown Co.* v. *Bowers, supra,* 358 U.S. 534, Justice Frankfurter, in his dissenting opinion, noted the lack of any real distinction between the facts there presented and those involved in *Low* v. *Austin* and said: "A close examination of the *Youngstown* case makes apparent this effective reversal of all previous judicial decision[s] on the Import Clause, and justifies concern over today's holding." (358 U.S. at p. 570 [3 L.Ed.2d at p. 512].)

Plaintiff's contention that more recent decisions of the Supreme Court have clearly recognized the continued viability of *Low* v. *Austin* is not supported by the cases it cites. *Richfield Oil Corp.* v. *State Board* (1946) 329 U.S. 69 [91 L.Ed. 80, 67 S.Ct. 156], dealt with a sales tax upon exports. In *Hooven & Allison Co.* v. *Evatt* (1945) *supra,* 324 U.S. 652 [89 L.Ed. 1252], there were four opinions: an opinion of the court, two dissenting opinions, and a concurring opinion. Four of the justices were of the opinion that the material imported was not immune from taxation. *Kosydar* v. *National Cash Register Co.* (1974) 417 U.S. 62 [40 L.Ed.2d 660, 94 S.Ct. 2108], involved an ad valorem tax upon goods intended for export but not yet in the process of export.

The opinion in *Michelin* cites as the basis for its overruling *Low* v. *Austin* a policy of fairly apportioning the cost of local services "among the beneficiaries according to their respective wealth." Limiting operation of the decision in Michelin to future tax years could only "retard" rather than "further" this objective. The second standard for retrospective operation set forth in *Chevron Oil Co.* v. *Huson, supra,* 404 U.S. 97, is, therefore, satisfied.

Finally, in cases such as *Michelin* and the case at bench, where the taxing authority has levied the tax upon the imported goods and has persisted in efforts to collect or has in fact collected it, it is reasonable to conclude there has been no such reliance upon the former rule as would render it inequitable to apply the decision retroactively. The element of inequity is particularly absent in the case at bench where for the full eight-year period in question plaintiff has paid the tax under protest, enjoying the benefit of the local services thereby funded, and the goods in question have been indiscriminately intermingled with domestic production, all of which was subject to such tax, and the aggregate marketed at one price in competition with other producers' products.[4] Under the circumstances, it is apparent there is no way plaintiff could have added the cost of such tax to the selling price of the imported portion of its general inventory. It manifested no distinguishing characteristic which would have permitted a price differential.

We, therefore, conclude that the decision in *Michelin* was intended to apply retrospectively under the circumstances of this case and that there is no reason it should not be so applied.

█ The same considerations require granting appellant's application to be relieved of paragraph 1 of the stipulation on the basis "the interests of justice so require." The interests of justice do not dictate permitting respondent to retain the benefits of the erroneous conclusion stated in paragraph 1 of the stipulation, and thus escape payment of its fair share of the cost of local government. It does not appear that respondent has been in any way prejudiced by the elimination of this issue from the case by virtue of the stipulation. All of the facts concerning the status of the

---

[4]We need not decide whether retrospective application of *Michelin* includes escape assessments pursuant to the provision of section 531 et seq. of the Revenue and Taxation Code upon importers whose property has not been assessed. No such assessment is needed in respect of plaintiff. If such assessments should at some point be denied upon the ground that such retrospective application of *Michelin* would be inequitable, no unconstitutional discrimination against plaintiff would be involved. The existence of such inequity would in itself be a valid classification.

taxed property were fully presented, and there is no suggestion that further or additional facts could have been presented which would avoid the effect of *Michelin* had the stipulation not been made.

■ The policy considerations above stated also render inapplicable the "general rule of appellate review that questions not raised in the trial court will not be considered on appeal."[5] (5 Cal.Jur.3d, Appellate Review, § 480, p. 117.) As this court said in *No Oil, Inc.* v. *Occidental Petroleum Corp.,* 50 Cal.App.3d 8, 26-27 [123 Cal.Rptr. 589]:

"[T]he general rule has no application where the point first raised on appeal involves a matter of significant public policy or public interest. 'The general rule precluding the raising of questions for the first time on appeal is subject to exception where fundamental error or gross irregularity is involved. . . . Also, matters involving public policy, such as an action to enforce an illegal contract or recover compensation therefrom, or matters involving the public interest, such as application of the rule against perpetuities, have been reviewed by the appellate court even though such matters were not presented to the trial court. [Fns. omitted.]' (5 Cal.Jur.3d 119-120.)

"In *Wong* v. *Di Grazia,* 60 Cal.2d 525, 532 footnote 9 [35 Cal.Rptr. 241, 386 P.2d 817], the court considered and disposed of an issue as to the effect of the rule against perpetuities which was not raised in the trial court. Concerning the effect of the parties' failure to raise the point below, the court said: 'The rule against perpetuities issue was first brought to the attention of the parties by a question during the oral argument before the District Court of Appeal. (See *Wong* v. *Di Grazia* (Cal.App.) 29 Cal.Rptr. 86, 88.) Defendants contend that the issue not having been raised at trial, it was improper for the District Court of Appeal, and would be improper for this court, to adjudicate that issue. We doubt the validity of this contention; in any event, the issue as to the rule against perpetuities of is [*sic*] considerable public interest; it has been fully argued before this court; we, accordingly, dispose of the issue on its merits.'

---

[5] By stipulation, the record has been augmented to include a trial brief filed by defendants, including an argument that *Low* v. *Austin* was no longer valid precedent in view of the decision in *Youngstown Co.* v. *Bowers, supra,* 358 U.S. 534, which validated nondiscriminatory ad valorem property taxes on goods imported for manufacture and stored for use at the factory. Defendants did not, however, advance the point, relied upon in *Michelin* to overrule *Low* v. *Austin,* that general ad valorem personal property taxes were not "imposts" or "duties."

"In *Claremont Imp. Club* v. *Buckingham*, 89 Cal.App.2d 32, 33 [200 P.2d 47], a restrictive covenant limiting residential occupancy to those of 'pure Caucasian blood' was upheld in the trial court over the objection that it was 'incapable of certain definition or determination.' 'Pending the appeal the Supreme Court ruled in *Cumings* v. *Hokr*, 31 Cal.2d 844 [193 P.2d 742], on authority of decisions of the United States Supreme Court that such covenants were unenforcible in the courts of this state. Appellants thereupon filed a brief attacking the constitutionality of the covenant on the authority of the *Cumings* case. Respondents now contend that it is too late to raise the issue on this appeal. It is true that appellants mentioned the matter of constitutionality casually at the trial, but it is also true that they did not raise the issue properly and did not ask for a ruling on it.' Nonetheless the court reversed the judgment below on the basis of the *Cumings* case. It said in this respect: 'Ordinarily when a question is raised for the first time on appeal it will not be accepted as proper grounds for a reversal of the trial court's judgment since that court was not given an opportunity to rule on it. But an adherence to that practice would not be justified in this case. The question of the constitutionality of such restrictive covenants has been a matter of judicial controversy for more than 50 years. If the Supreme Court had determined it prior to the trial of this case judgment for the defendants would have followed necessarily.' "

The policy which dictated the Supreme Court's decision in *Michelin*—fair distribution of the burden of the costs of local government—is at least as significant as those involved in *Wong* v. *Di Grazia*, 60 Cal.2d 525 [35 Cal.Rptr. 241, 386 P.2d 817], and *Claremont Imp. Club* v. *Buckingham*, 89 Cal.App.2d 32 [200 P.2d 47]. This case should, therefore, be decided in conformity with that policy, even though the point may not have been fully raised in the trial court.

The judgment is reversed.

Cobey, Acting P. J., and Allport, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 2, 1976.