WESTERN OIL REFINING COMPANY *v.* DALTON, CLERK OF
COUNTY COURT.*

(*Nashville.* December Term, 1914.)

COMMERCE. Interstate commerce. Privilege tax. "Transaction commercially continuous."

Laws 1909, ch. 479, sec. 4, provides that every corporation or local agent having oil depots or warehouses for delivering oil, or any local agent using a railroad car or railroad depot for such purpose, shall pay a privilege tax. Plaintiff oil company had its principal place of business, and also its barrel factory, in Indiana, and had a refinery in Illinois, and had no branch office in the State, but its salesman, employed on a salary, and without interest in its collections, took orders for oil and barrels addressed to plaintiff, which shipped a tank car of oil from its refinery and a car of barrels from its factory to a point in the State, consigned to itself, on arrival of which the salesman notified customers, and, if they furnished barrels, delivered oil from the car, and, if they furnished no barrels, took barrels from the car and filled them from the tank car, and made collections at the time, and some customers left their barrels of oil at the side of the track for several days before removing them, and any barrels not taken away were reshipped to plaintiff in Kentucky. *Held,* that the barrels were offered "as a part of a transaction commercially continuous," and as incidental to delivery under the first act of transportation; that the putting of the oil in barrels did not constitute a local depot; and that the oil and barrels were within the protection of the commerce clause, and hence not liable to the privilege tax.

Acts cited and construed: Acts 1909, ch. 479, sec. 4.

Cases cited and distinguished: Caldwell v North Carolina, 187 U. S., 625; Rearick v. Pennsylvania, 203 U. S., 510.

---

*On the question of license or occupation tax on hawkers and peddlers, and persons engaged in soliciting orders by sample or otherwise as a violation of the commerce clause, see notes in 19 L. R. A. (N. S.), 297 and 28 L. R. A. (N. S.), 265.

Refining Co. v. Dalton.

Cases cited and approved: Austin v. Tennessee, 179 U. S., 359; Brown v. Maryland, 12 Wheat., 443; May v. New Orleans, 178 U. S., 51; Lovehin v. Tansil, 118 Tenn., 717; Dozier v. Alabama, 218 U. S., 124; Crenshaw v. Arkansas, 227 U. S., 389; Stewart v. Michigan, 232 U. S., 665; General Oil Co. v. Crain, 209 U. S., 211.

### FROM TROUSDALE.

Appeal from the Circuit Court of Trousdale County. —J. H. GORDENHIRE, Judge.

TRUE & DORSEY and J. D. McMURRAY, for appellant.

FRANK M. THOMPSON, Attorney-General, for appellee.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

This suit was begun before a justice of the peace by the Western Oil Refining Company, hereinafter referred to as the Oil Company, against Dalton, clerk of the county court, to recover a sum demanded of it as a privilege tax, and which it paid under protest. From an adverse judgment the Oil Company prosecuted an appeal to the circuit court, where the case was heard on an agreed statement of facts, and the Oil Company denied relief; this appeal resulting.

The Oil Company was incorporated under the laws of Indiana; its principal office and place of business being at Indianapolis. It maintains no branch offices, and has had no office, agency, or warehouse in this

State. It has a refinery at Lawrenceville, Ill., the products of which it sells direct to the trade. It also manufactures in the State of Indiana steel barrels to contain oil so produced. These products are marketed through the medium of salesmen, one of whom was Todd, whose field included portions of Tennessee.

In accordance with the regular system, Todd went to Trousdale county and took written orders for oils and barrels, which orders were addressed to the company; these orders being taken on condition that a sufficient number of the same could be procured to justify a shipment to Hartsville in that county, where the purchasers were to receive the goods. The orderers were given the privilege of examining the goods to ascertain whether they were as represented.

A specimen of the order is as follows:

### WESTERN OIL REFINING COMPANY,
### INDIANAPOLIS, IND.

Order No. 132.                      Date, May 1.

Sold to William B. Smith; ship to Hartsville, Tenn.; post office, R. R. 2, Templow, Tenn.

How to ship, ......; when, ......

Terms, C. O. D.; telephone, Nos. 300, 143.

50 gallons kerosene ........................$ 6.50

1 steel barrel ...........................   5.50

                                          ————

                                          $12.00

[Signed]   Purchaser, WILLIAM B. SMITH.

Salesman, J. E. TODD.

In some instances, however, the purchaser of oil had his own barrel and ordered only oil.

On receipt of the orders, the company shipped a tank car of oil from its refinery in Illinois and a car load of barrels from Indiana to itself at Hartsville for the purpose of filling the orders.

Upon arrival of these cars at Hartsville, the agent of the railroad company there wired the Oil Company, whereupon it by mail notified the purchasers, and sent Todd from Indiana, his home, to make deliveries, but only to ordering customers, which deliveries were made in manner following:

To those who had ordered only oil, the quantity specified in the order, and no more, was drawn from the tank car used for transport into the customer's barrel; otherwise a barrel as specified was taken from the car load of barrels and filled with oil so drawn; collections being made at the time. There was no storage of the oil in a depot or warehouse, or at all, except that a few customers were late in coming in, and a few barrels of oil were left as long as several days for them at the side of the railroad track, and the cars used for interstate transport released. Most of these customers later called for and took these barrels so temporarily left for them. Any barrels not so taken up were reshipped to the Oil Company at Scotsville, Ky.

At the end of each day's delivery Todd remitted all collections to the Oil Company at Indianapolis. He was paid his salary and expenses from that point,

and had no monetary interest in the sales or collections.

By adopting this method of sale and delivery approximately one-half cent per gallon was saved in freight charges, and was more convenient.

The authority under which the clerk, Dalton, demanded and collected the privilege tax was section 4 of chapter 479 of the Acts of Tennessee of 1909, which provides that:

"Each and every person, firm, partnership, corporation, or local agent having oil depots, storage tanks, or warehouses for the purpose of selling, delivering, or distributing oil of any description, and each and every person, firm, partnership, corporation, or local agent using a railroad car or railroad depots for such purpose, shall pay a privilege tax as follows," etc.

The Oil Company's theory for recovery is that these commodities were protected as being in the course of interstate commerce, and therefore not subject to the local taxing power.

The contentions of the defendant clerk in support of the taxing power of the State are that the mode of shipment was a scheme or device adopted by the Oil Company to evade or circumvent the tax laws of this State, within the scope of the ruling in the case of *Austin* v. *Tennessee,* 179 U. S., 359, 21 Sup. Ct., 132, 45 L. Ed., 232; and, further, that in the transfer of oil from tank cars into barrels at Hartsville, in this State, the commodities (oil and barrels) had come to rest in this State from course of commerce, and were thus

so "acted upon" by the consignor as that the origi-
nal package, the tank, was broken, and new packages
created, thus losing to the commodities their distinct
character of interstate shipments, and bringing them
within the range of local .taxation, within the claimed
meaning of *Brown* v. *Maryland,* 12 Wheat., 443, 6 L.
Ed., 678, and *May* v. *New Orleans,* 178 U. S., 501, 20
Sup. Ct., 976, 44 L. Ed., 1167.

These contentions of the defendant clerk must be
tested as to soundness by several rulings made in re-
cent cases by the supreme court of the United States
in which the character of commodities has been con-
sidered, in such connection, and defined with no incon-
siderable nicety. This test may be by us made to best
purpose by taking up and analyzing these federal de-
cisions, which must govern us in determination of the
pending case, in historical order.

In *Caldwell* v. *North Carolina,* 187 U. S., 625, 23
Sup. Ct., 229, 47 L. Ed., 338, reversing 127 N. C., 521,
37 S. E., 138, it appeared that the Chicago Portrait
Company, from its office in Chicago, after taking or-
ders in North Carolina, shipped to Greensboro, in that
State, enlarged portraits, and, in a separate package,
picture frames; that, on receipt at Greensboro, Cald-
well, as agent of the portrait company, carried them
to a room of the company, opened the boxes in which
the respective shipments were made, assorted and put
together the pictures and frames, and made deliveries
to purchasers in Greensboro. The court, through Mr.
Justice Shiras, said:

"That the frames and the pictures were separate packages, if such was the case, was merely for convenience in packing and handling, and 'placing the pictures in their proper places' [the language of the verdict] meant that each picture was placed in the frame designed for it. The selection of the frame was as much a part of the purchase and sale as the selection of the picture."

The argument of the supreme court of North Carolina had been that, as the pictures had not been completed by their being framed in Chicago, no title passed from the company to a given purchaser until the pictures were put into the frames and delivered by agent Caldwell, and that, as the act of combination and completion and the act of delivery were in North Carolina, the local tax law was applicable.

We think it obvious that the federal supreme court put its immediate holding *contra* on the point that a particular picture and a particular frame were originally designed the one for the other, before consignment, in conformity with the selection of the frame on the part of the customer; further, that the separation of the packages was treated as being merely for convenience in handling.

In the case of *Rearick v. Pennsylvania*, 203 U. S., 510, 27 Sup. Ct., 159, 51 L. Ed., 295, reversing 26 Pa. Super. Ct., 384, a shipment of brooms was involved. An Ohio concern employed an agent to solicit orders in Pennsylvania, and, when it had received a large number of orders, it filled them at its place of business

in Columbus, forwarding the goods to defendant Rearick, its agent, by rail, addressed to him, but marked, "For A. B.," the customer, with the number of the order also on the given package, for further identification. Only Rearick had authority to receipt the carrier, and he made deliveries if the customer did not refuse the commodity as not being up to sample—a right reserved. The brooms in question were tagged and marked, but they were tied together in bundles of about a dozen, for convenience in shipment. It was contended that the brooms, before they were sold, had become mingled with, or a part of, the common mass of goods in the State, and so subject to the local tax law. The court held, however, that the brooms were specifically appropriated to specific contracts of sale, in a practical, if not in a technical, sense, and that, "under such circumstances, it is plain that, wherever may have been the title, the transport of the brooms for the purpose of filling the contracts was protected commerce."

It was hinted, if not plainly pointed out, in the *Rearick Case,* that actual appropriation to specific purchasers of the goods is not the distinguishing mark; that such might bear on the question of title; but that the nonpassing of title from the vendor to the vendee is not itself a governing factor in determining whether the commerce in the commodities continues to be protected.

This court, in the case of *Loverin* v. *Tansil,* 118 Tenn., 717, 102 S. W., 77, treated the *Rearick Case* as

one that yet held to the doctrine of preappropriation and identification of parts of the goods shipped, so to speak, in bulk, and said:

"In the case at bar the goods are packed and shipped in bulk, in unidentified packages, not segregated from others of like kind, or appropriated to any particular purchaser, and remained the property of the seller until the original packages were broken, and the articles selected and delivered, and the sale consummated in Tennessee. . . .

"The case of *Rearick* v. *Com. of Pennsylvania,* we think, carried the protection of the commerce clause of the constitution to its utmost limit. We do not believe that it will be further extended; certainly not to cover a case of this kind."

*Dozier* v. *Alabama,* 218 U. S., 124, 30 Sup. Ct., 649, 54 L. Ed., 965, 28 L. R. A. (N. S.), 264, reversing 154 Ala., 83, 46 South., 9, 129 Am. St. Rep., 51, involved the shipment of pictures and frames, and the State court had held the pictures to be protected while the frames were not; it taking the distinction on the ground that, as to the frames, there was no contract of sale consummated until after the arrival of the frames in Alabama; that by the terms of the contract the customer was not bound to accept and pay for the frame. The contract of sale of the picture called for its delivery to the purchaser "in an appropriate frame, which this contract entitles me to accept at factory prices."

131Tenn22

The United States supreme court, admitting that the customer was not bound to take the frame unless he saw fit, and that the sale took place in Alabama, said:

"As was hinted in *Rearick* v. *Pennsylvania,* . . . what is commerce among the States is a question depending upon broader considerations than the existence of a technically binding contract, or the time and place where the title passed. It was agreed that the frame should be offered along with the picture. The offer was a part of the interstate bargain, and, as it was agreed that the frame should be offered 'at factory prices,' and the company and factory were in Chicago, obviously it was contemplated, if not agreed, that the frame should come on with the picture. In fact, the frames were sent on with the pictures from Chicago, and were offered when the pictures were tendered, as part of a transaction commercially continuous. . . . We are of opinion that the sale of the frames cannot be so separated from the rest of the dealings between the Chicago company and the Alabama purchaser as to sustain the license tax upon it."

In the case of *Crenshaw* v. *Arkansas,* 227 U. S., 389, 33 Sup. Ct., 57 L. Ed., 565, reversing 95 Ark., 464, 130 S. W., 569, a shipment of cooking ranges was under consideration. The State court construed the opinion in the case of *Rearick* v. *Pennsylvania,* supra, to be based upon the appropriation by a tagging of the wares by the vendor in Ohio to the fulfillment of the contract of sale as being the turning or ruling point,

and gave, as one of two reasons, that the cooking ranges in question were not separated or tagged with the name of any particular purchaser, but that the appropriation was made by the agent of the vendor after the goods reached Arkansas.   Disposing of the case on writ of error, M.r Justice Day, for the supreme court, combated the other reason given by the Arkansas court, but did not in terms refute the one outlined above.   As indicated, however, the holding of the State court was reversed.

The latest case is that of *Stewart* v. *Michigan*, 232 U. S., 665, 34 Sup. Ct., 476, 58 L. Ed., 786, reversing 167 Mich., 417, 132 N. W., 1071, which holds that merchandise shipped from Illinois to Michigan in cars is protected as being in interstate commerce, where upon arrival of the cars in Michigan goods therein are delivered to customers by draymen employed by the defendant consignors, who fill orders at the cars by checking from the original orders; there being no identifying marks on the packages except as to contents. The court treated the State's contention as foreclosed by the decision in *Crenshaw* v. *Arkansas,* without any reference to the previous cases in which the acts of designation, identification, or selection of the commodities for the particular customer seem to have been made the basis of decision.

This resume of the later decisions of the highest federal tribunal fully justify the following comment of Mr. Justice Shiras in *Caldwell* v. *North Carolina,* supra:

"It cannot escape observation that efforts to control commerce of this kind, in the interest of the States where the purchasers reside, have been frequently made in the form of statutes and municipal ordinances, but that such efforts have been heretofore rendered fruitless by the supervising action of this court. The cases hereinbefore cited disclose the truth of this observation."

It may be remarked that the subsequent course of adjudication makes yet more patent the truth of the observation.

However, in *General Oil Co.* v. *Crain,* 209 U. S., 211, 28 Sup. Ct., 475, 52 L. Ed., 754, affirming 117 Tenn., 82, 95 S. W., 824, 121 Am. St. Rep., 967, it appeared that the company sought to be subjected to our tax laws was a Tennessee corporation, with its principal place of business in Memphis. Its plants for the manufacture of oil were located in the States of Pennsylvania and Ohio. A distinct branch of the company's business was that of transporting oil in tanks, the course of business being, in relation thereto, as follows:

To the company as consignee at Memphis oil was brought in tank cars from their producing plants. This oil, sold before shipment, was unloaded at Memphis only for the purpose of distribution in smaller vessels to meet the requirements of orders received from customers in the States of Arkansas, Louisiana, and Mississippi (excluding Tennessee), from whom the company always had on hand many unfilled orders for

oil, to be delivered as soon as convenient. This oil was kept separate from oils for sale in Tennessee, in a tank marked, ''Oil Already Sold in Arkansas, Louisiana, and Mississippi,'' and remained in Tennessee only long enough (a few days) to be properly distributed according to the orders therefor. The court said that this oil first consigned to Memphis ''was not in movement through the State,'' and, further, that it was held at Memphis, not in necessary delay or accommodation to the means of transportation, but for the business purpose and profit of the company.

''It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the State beyond a mere halting in its transportation. It required a storage there—the maintenance of the means of storage; of putting it in and taking it from storage. The bill takes pains to allege this.  .  .  .

''This certainly describes a business—describes a purpose for which the oil is taken from transportation, brought to rest in the State, and for which the protection of the State is necessary—a purpose outside of the mere transportation of oil.''

We think it apparent that, as between the rulings in the first set of cases and in the case last quoted from, the correct decision of the pending case must depend upon a close differentiation, in the attempted making of which we could wish that the federal tribunal had spoken more pointedly in the case of *Crenshaw* v. *Arkansas* or in *Stewart* v. *Michigan* touching the test con-

ceived to have been formerly applied by it—the preappropriation of the commodities to respond to the order of the bargaining customer.

. If we treat this test as one now discarded, we still arrive at the conclusion that the oil and barrels were within the protection of the commerce clause of the federal constitution. Although there were two shipments, the one from Indiana and the other from Illinois, each was but a part of the bargain of a sale that required interstate transportation to consummate. The barrels were to be offered along with the oil, and were so offered and received "as a part of a transaction commercially continuous."

The change in or readjustment of the two commodities—the placing of the oil in barrels—was not at a local plant for the purpose of a reconsignment, as in *General Oil Co.* v. *Crain*, but was an incident to delivery under the first act of transportation, and to be likened to the fitting of portraits to frames in the local State involved in *Caldwell* v. *North Carolina.*

We therefore are of opinion that the trial judge was in error. Reversed, with judgment here in favor of the Oil Company.