THOMPSON, Presiding Judge.
P.J. Lumber Company, Inc. ("P.J. Lumber"), appeals from a summary judgment that the Mobile Circuit Court entered upholding a decision of the City of Prichard ("the city") denying P.J. Lumber's request for a partial refund of the amount it had paid for business-license taxes. P.J. Lumber claimed that the city had improperly included P.J. Lumber's gross revenue from international sales when it calculated the amount of the business-license taxes. P.J. Lumber argued that the use of revenue from exported goods in calculating the taxes ran afoul of the Import-Export Clause of the United States Constitution.
The facts in this case are not disputed. The record demonstrates that P.J. Lumber, whose principal place of business is within the geographical limits of the city, sells lumber both within the United States and internationally. From 2009 through 2014, P.J. Lumber paid the city business-license taxes, the amount of which was based on P.J. Lumber's gross revenue, including domestic and foreign sales. On October 21, 2015, P.J. Lumber submitted to the city a request for a refund of the business-license taxes it had paid that had *1137 been based on foreign sales. P.J. Lumber calculated that it was owed a refund of $21,855.02 for the years 2009 through 2014. The city did not respond to P.J. Lumber's request. Therefore, the request was deemed denied six months later, on April 21, 2016. § 11-51-191(g)(3), Ala. Code 1975.
P.J. Lumber appealed the city's denial of the refund to the circuit court on May 11, 2016. When the city had not timely responded to P.J. Lumber's appeal, P.J. Lumber filed a motion for a default judgment on July 6, 2016. On July 14, 2016, the circuit court entered a default judgment against the city. On July 28, 2016, the city filed a motion to vacate the default judgment, asserting that the "matter was inadvertently not forwarded from the [city] Clerk's office to the municipal insurance carrier." The circuit court granted the city's motion and vacated the default judgment on August 10, 2016. P.J. Lumber did not file a motion in the circuit court to challenge the decision to vacate the default judgment, and the litigation proceeded.
P.J. Lumber and the city filed competing motions for a summary judgment. On January 16, 2017, the circuit court entered a partial summary judgment in favor of the city finding that P.J. Lumber's request for a refund for the years 2009 through 2012 was time-barred. The circuit court directed the city to brief the issue of whether the amount of business-license taxes assessed against P.J. Lumber could be based at least in part on revenue generated from P.J. Lumber's foreign sales. On May 3, 2017, after considering the arguments of the parties, the circuit court entered a judgment determining that the business-license taxes that the city had levied on P.J. Lumber did not violate the United States Constitution and that P.J. Lumber was not owed a refund. P.J. Lumber timely appealed to the Alabama Supreme Court, which transferred the appeal to this court because original appellate jurisdiction lies with this court. § 12-3-10, Ala. Code 1975.
P.J. Lumber first contends that the circuit court abused its discretion by setting aside the default judgment. The record shows that this issue was never raised before the circuit court and is therefore not preserved for this court's review. " '[I]t is a well-settled rule that an appellate court's review is limited to only those issues that were raised before the trial court. Issues raised for the first time on appeal cannot be considered.' " Neal v. Neal, 856 So.2d 766, 778 (Ala. 2002) (quoting Beavers v. County of Walker, 645 So.2d 1365, 1372 (Ala. 1994) ).
In its reply brief, P.J. Lumber asserts that it first addressed "the issue" when it filed its motion requesting the default judgment. It then states, "[t]here is no implied waiver of the relief that P.J. Lumber already sought (and received)." However, filing a motion to request a default judgment and challenging the circuit court's decision to set aside a default judgment are two separate things occurring at separate steps of the litigation. In Head v. Triangle Construction Co., 274 Ala. 519, 522, 150 So.2d 389, 392 (1963), our supreme court explained the reason for requiring an objection to be raised in the trial court to preserve an issue for appellate review:
"The general rule is that the appellate court will review only questions that are raised by the record. This rule is premised on the doctrine that the trial court should first have the opportunity to rule on all points. The duty of an appellate court is to review the action of the lower court to ascertain whether or not error was committed; it is not to entertain any issue whatsoever that parties wish to raise. All reviewable matters stem solely from the record.
*1138 Hamilton Motor Co. v. Cooner, [254 Ala. 422, 47 So.2d 270 (1950) ] ; Southern Cement Co. v. Patterson, 271 Ala. 128, 122 So.2d 386 [ (1960) ] ; McElhaney v. Singleton, 270 Ala. 162, 117 So.2d 375 [ (1960) ]; State v. Moore, 269 Ala. 20, 110 So.2d 635 [ (1959) ]. And it has been stated by this court that it would review a case only on the same theory that was presented to the trial court. Southern Railway Co. v. McCamy, 270 Ala. 510, 120 So.2d 695 [ (1960) ]."
It is axiomatic that "[t]his Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court." Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992) ; Shiver v. Butler Cty. Bd. of Educ., 797 So.2d 1086, 1089 (Ala. Civ. App. 2000) (holding that an appellate court will not consider an issue on which the trial court was not given the opportunity to rule). Because "[i]t is well settled that an appellate court may not hold a trial court in error in regard to theories or issues not presented to that court," Allsopp v. Bolding, 86 So.3d 952, 962 (Ala. 2011), we will not reverse the judgment of the circuit court on this ground.
Turning to the merits of the other arguments made in P.J. Lumber's brief on appeal, we note that our standard when reviewing a summary judgment is as follows:
"We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing 'that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.' Rule 56(c)(3) ; see Lee v. City of Gadsden, 592 So.2d 1036, 1038 (Ala. 1992). If the movant meets that burden, 'the burden then shifts to the nonmovant to rebut the movant's prima facie showing by "substantial evidence." ' Lee, 592 So.2d at 1038 (footnote omitted). '[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989) ; see Ala. Code 1975, § 12-21-12(d). Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant and must entertain all reasonable inferences from the evidence that a jury would be entitled to draw. See Nationwide Prop. & Cas. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala. 2000) ; and Fuqua v. Ingersoll-Rand Co., 591 So.2d 486, 487 (Ala. 1991).
Bailey v. Jacksonville Health & Rehab. Ctr., 249 So.3d 499, 501 (Ala. Civ. App. 2017). In this matter, the evidence was undisputed. Therefore, we review this matter to determine whether the city was entitled to a judgment as a matter of law.
P.J. Lumber does not challenge the circuit court's ruling that its request for a refund of a portion of the business-license taxes it paid for 2009 through 2012 was barred by the applicable statute of limitations. However, P.J. Lumber says, it still believes it is entitled to a refund in the amount of $5,385.40 for business-license taxes it paid in 2013 and 2014. In requesting the refund from the city, P.J. Lumber asserted that the city had improperly included gross revenues from its export sales to calculate the business-license taxes because, P.J. Lumber said, the Import-Export *1139 Clause of the United States Constitution prohibits the city from taxing exports.
In the judgment, the circuit court specifically found that the city's business-license tax was not a prohibited impost or duty. The Import-Export Clause, Art. I, § 10, cl. 2, of the United States Constitution, provides, in pertinent part: "No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws ...."
On appeal, P.J. Lumber contends that the only applicable authority supports its position that, pursuant to the Import-Export Clause, the city could not levy a business-license tax based on the gross receipts of goods that P.J. Lumber exported. In making this argument, P.J. Lumber cites a number of cases decided before 1976, when, in Michelin Tire Corp. v. Wages, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976), the United States Supreme Court "initiated a different approach to Import-Export Clause cases." Department of Revenue of State of Washington v. Association of Washington Stevedoring Cos., 435 U.S. 734, 752, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). With the change in approach announced in Michelin, the authority that P.J. Lumber relies on to support its contentions are no longer valid. In fact, in Washington Stevedoring, the United States Supreme Court noted that the reliance by one of the parties in that case on Richfield Oil Corp. v. State Board of Equalization, 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946), the case on which P.J. Lumber primarily relies, "ignores the central holding of Michelin that the absolute ban is only of 'Imposts or Duties' and not of all taxes." Washington Stevedoring, 435 U.S. at 759, 98 S.Ct. 1388.
The United States Supreme Court pointed out in Washington Stevedoring that, before Michelin, "cases had assumed that all taxes on imports and exports and on the importing and exporting process were banned by the [Import-Export] Clause." 435 U.S. at 752, 98 S.Ct. 1388. However, in Michelin, the Supreme Court "analyzed the nature of the tax to determine whether it was an 'Impost or Duty,' " id., and, "for the first time," determined "which taxes fell within the absolute ban on 'Imposts or Duties.' " Id. at 751, 98 S.Ct. 1388. In Michelin, the Supreme Court concluded that a nondiscriminatory ad valorem property tax was "not the type of state exaction which the Framers of the Constitution or the [Supreme] Court in Brown [ v. Maryland, 25 U.S. (12 Wheat.) 419, 6 L.Ed. 678 (1827),] had in mind as being an 'impost' or 'duty.' " 423 U.S. at 283, 96 S.Ct. 535. The Michelin Court examined the history of the Import-Export Clause to devise an analysis by which to determine the types of taxes that were meant to be included in the prohibition of "Imposts or Duties" on imports and exports. The Supreme Court wrote:
"The Framers of the Constitution ... sought to alleviate three main concerns by committing sole power to lay imposts and duties on imports in the Federal Government, with no concurrent state power: the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other *1140 States not situated as favorably geographically.
"Nothing in the history of the Import-Export Clause even remotely suggests that a nondiscriminatory ad valorem property tax which is also imposed on imported goods that are no longer in import transit was the type of exaction that was regarded as objectionable by the Framers of the Constitution. For such an exaction, unlike discriminatory state taxation against imported goods as imports, was not regarded as an impediment that severely hampered commerce or constituted a form of tribute by seaboard States to the disadvantage of the other States.
"It is obvious that such nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce, probably the most important purpose of the Clause's prohibition. By definition, such a tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any importation in a manner inconsistent with federal regulation.
"Nor will such taxation deprive the Federal Government of the exclusive right to all revenues from imposts and duties on imports and exports, since that right by definition only extends to revenues from exactions of a particular category; if nondiscriminatory ad valorem taxation is not in that category, it deprives the Federal Government of nothing to which it is entitled. Unlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into a country, such property taxes are taxes by which a State apportions the cost of such services as police and fire protection among the beneficiaries according to their respective wealth; there is no reason why an importer should not bear his share of these costs along with his competitors handling only domestic goods. The Import-Export Clause clearly prohibits state taxation based on the foreign origin of the imported goods, but it cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the State supplies. See, e.g., May v. New Orleans, 178 U.S. 496, 502-504, 507-509, 20 S.Ct. 976, 44 L.Ed. 1165 (1900). It may be that such taxation could diminish federal impost revenues to the extent its economic burden may discourage purchase or importation of foreign goods. The prevention or avoidance of this incidental effect was not, however, even remotely an objective of the Framers in enacting the prohibition. Certainly the Court in Brown[ v. Maryland ] did not think so. See 12 Wheat. [419], at 443-444, 6 L.Ed. 678 [ (1827) ]. Taxes imposed after an initial sale, after the breakup of the shipping packages, or the moment goods imported for use are committed to current operational needs are also all likely to have an incidental effect on the volume of goods imported; yet all are permissible. See, e.g., Waring v. The Mayor, 8 Wall. 110, 19 L.Ed. 342 (1869) (taxation after initial sale); May v. New Orleans, supra (taxation after breakup of shipping packages); Youngstown Sheet & Tube Co. v. Bowers, 358 U.S. 534, 79 S.Ct. 383, 3 L.Ed.2d 490 (1959) (taxation of goods committed to current operational needs by manufacturer). What those taxes and nondiscriminatory ad valorem property taxes share, it should be emphasized, is the characteristic that they cannot be selectively imposed and increased so as substantially *1141 to impair or prohibit importation.
"Finally, nondiscriminatory ad valorem property taxes do not interfere with the free flow of imported goods among the States, as did the exactions by States under the Articles of Confederation directed solely at imported goods. ... To be sure, allowance of nondiscriminatory ad valorem property taxation may increase the cost of goods purchased by 'inland' consumers. But as already noted, such taxation is the quid pro quo for benefits actually conferred by the taxing State. There is no reason why local taxpayers should subsidize the services used by the importer; ultimate consumers should pay for such services as police and fire protection accorded the goods just as much as they should pay transportation costs associated with those goods. An evil to be prevented by the Import-Export Clause was the levying of taxes which could only be imposed because of the peculiar geographical situation of certain States that enabled them to single out goods destined for other States. In effect, the Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State. A nondiscriminatory ad valorem property tax obviously stands on a different footing, and to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed."
Michelin, 423 U.S. at 285-90, 96 S.Ct. 535 (footnotes omitted).
Washington Stevedoring, supra, involved the issue of whether Washington's business and occupation tax applied to stevedores, who loaded and unloaded cargo from ships, i.e., who handled exported and imported goods. The United States Supreme Court applied the Michelin analysis to determine that the tax as applied to stevedores "violate[d] none of the constitutional policies identified in Michelin." Washington Stevedoring, 435 U.S. at 761, 98 S.Ct. 1388. The United States Supreme Court explained that,
"[f]irst, the tax does not restrain the ability of the Federal Government to conduct foreign policy. As a general business tax that applies to virtually all businesses in the State, it has not created any special protective tariff. The assessments in this case are only upon business conducted entirely within Washington. No foreign business or vessel is taxed. Respondents, therefore, have demonstrated no impediment posed by the tax upon the regulation of foreign trade by the United States.
"Second, the effect of the Washington tax on federal import revenues is identical to the effect in Michelin. The tax merely compensates the State for services and protection extended by Washington to the stevedoring business. Any indirect effect on the demand for imported goods because of the tax on the value of loading and unloading them from their ships is even less substantial than the effect of the direct ad valorem property tax on the imported goods themselves.
"Third, the desire to prevent interstate rivalry and friction does not vary significantly from the primary purpose of the Commerce Clause. See P. Hartman, State Taxation of Interstate Commerce 2-3 (1953). The third Import-Export Clause policy, therefore, is vindicated if the tax falls upon a taxpayer with reasonable nexus to the State, is properly apportioned, does not discriminate, and relates reasonably to services provided by the State. As has been explained ..., the record in this case, as *1142 presently developed, reveals the presence of all these factors.
"Under the analysis of Michelin, then, the application of the Washington business and occupation tax to stevedoring violates no Import-Export Clause policy and therefore should not qualify as an 'Impost or Duty' subject to the absolute ban of the Clause."
Washington Stevedoring, 435 U.S. at 754-55, 98 S.Ct. 1388.
The United States Supreme Court also took the opportunity in Washington Stevedoring to clarify its intention that
"the Michelin approach should apply to taxation involving exports as well as imports. The prohibition on the taxation of exports is contained in the same Clause as that regarding imports. The export-tax ban vindicates two of the three policies identified in Michelin. It precludes state disruption of the United States foreign policy. It does not serve to protect federal revenues, however, because the Constitution forbids federal taxation of exports. U.S. Const., Art. I, § 9, cl. 5 ; see United States v. Hvoslef, 237 U.S. 1, 35 S.Ct. 459, 59 L.Ed. 813 (1915). But it does avoid friction and trade barriers among the States. As a result, any tax relating to exports can be tested for its conformance with the first and third policies. If the constitutional interests are not disturbed, the tax should not be considered an 'Impost or Duty' any more than should a tax related to imports. This approach is consistent with Canto R. Co. [v. Rogan, 340 U.S. 511, 71 S.Ct. 447, 95 L.Ed. 488 (1951) ], which permitted taxation of income from services connected to both imports and exports. The respondents' gross receipts from loading exports, therefore, are as subject to the Washington business and occupation tax as are the receipts from unloading imports."
435 U.S. at 758, 98 S.Ct. 1388 (footnotes omitted).
The tax at issue in this case is the city's business-license tax. In City of Pinson v. Utilities Board of Oneonta, 986 So.2d 367, 371-72 (Ala. 2007), our supreme court set forth the authority for and purpose of the business-license tax, writing:
"Section 11-51-90 expressly permits municipalities 'to impose[ ] the tax or license fee in return for the privilege of engaging in a trade, occupation or profession in the [municipality] and for being afforded the benefit of the facilities of the [municipality] while in the pursuit of that business.' McPheeter v. City of Auburn, 288 Ala. 286, 290, 259 So.2d 833, 835 (1972) (interpreting the predecessor statute to § 11-51-90); see also American Bankers Life Assurance Co. of Florida v. City of Birmingham, 632 So.2d 450, 452 (Ala. 1993) ('The State of Alabama authorizes municipalities to impose business license fees upon businesses, trades, and professions for the privilege of conducting business within the city or town.'). Thus, although a tax ordinance might measure the amount of tax owed based on the gross receipts of the Utilities Board, the subject of a license or privilege tax is not the 'purchase, sale, use, or consumption of property'; instead, the subject of the tax is the privilege of conducting or the opportunity to conduct a business in the municipal limits or within a municipality's police jurisdiction."
P.J. Lumber challenges the business-license tax to the extent that the amount assessed includes gross receipts on exported goods. Because P.J. Lumber's challenge involves only the receipts on exports, we apply the first and third of the policy considerations set forth in Michelin to determine if the tax is of the type contemplated by the Import-Export *1143 Clause. Washington Stevedoring, 435 U. S. at 758, 98 S.Ct. 1388. The first consideration, whether the business-license tax restrains the ability of the federal government to conduct foreign policy, is not triggered. The undisputed evidence reveals that the business-license tax is a nondiscriminatory tax applied to all businesses operating within the geographical limits of the city regardless of whether a business imports or exports goods. P.J. Lumber has not shown that the tax created a special protective tariff. There is no evidence indicating that the business-license tax, imposed for the privilege of operating a business within the geographical limits of the city, impedes in any way the regulation of foreign trade.
The third policy consideration, whether the business-license tax affects harmony among the states, is similarly not affected by the tax. P.J. Lumber has not shown that the city's business-license tax creates interstate rivalry or friction between the states, although the nondiscriminatory business-license tax, assessed against all of the businesses operating within the geographical limits of the city, albeit at different rates, may increase the cost of goods purchased by consumers.[1] As the United States Supreme Court stated in Michelin,
"as already noted, such taxation is the quid pro quo for benefits actually conferred by the taxing State [or municipality]. There is no reason why local taxpayers should subsidize the services used by the importer; ultimate consumers should pay for such services as police and fire protection accorded the goods just as much as they should pay transportation costs associated with those goods."
423 U.S. at 289, 96 S.Ct. 535. Under P.J. Lumber's argument, if it exported all of its goods, it would expect to be exempt from paying any amount based on its gross receipts. In that scenario, P.J. Lumber would still be able to take advantage of city services without paying its proportional share for those services.
The nondiscriminatory business-license tax has no impact on the federal government's regulation of foreign commerce, nor does it interfere with the flow of goods among the states. Accordingly, we hold that the amount P.J. Lumber must pay for the city's business-license tax, which is based in part on P.J. Lumber's gross receipts for exported goods, is not an impost or duty of the type contemplated by the Import-Export Clause and, thus, does not violate the United States Constitution. The circuit court correctly found that the business-license tax is not a prohibited impost or duty and does not frustrate the purposes of the Import-Export Clause. Thus, the circuit court's judgment determining that, as a matter of law, P.J. Lumber is not entitled to a partial refund on the amount of taxes it paid to the city is due to be affirmed.
Because we hold that the city's business-license tax is constitutional and that P.J. Lumber was required to pay the full amount of the taxes assessed, we pretermit discussion of P.J. Lumber's contention that it did not "voluntarily" pay the taxes and is therefore entitled to a partial refund of the amount paid.
For the reasons set forth above, the judgment is due to be affirmed. The city's motion to strike a portion of P.J. Lumber's reply brief on appeal is granted to the extent that the complained of portion of *1144 the brief raised an argument not made in its original brief on appeal.
AFFIRMED.
Pittman, Thomas, Moore, and Donaldson, JJ., concur.

The city's business-license-tax schedule indicates that the cost of the license for a retail lumber dealer or a lumber yard, defined as "a person, firm, or corporation engaged in the business of selling lumber and lumber projects in retail quantities direct to consumers or contractors," is $150 plus .001590 of gross receipts.